500 F.Supp. 529 (1980)
Fred OSTERHOLT, Plaintiff,
v.
ST. CHARLES DRILLING COMPANY, INC., Defendant.
No. 78-1357-C(3).
United States District Court, E. D. Missouri, E. D.
October 14, 1980.
*530 Frank Susman, Barbara L. Beran, Clayton, Mo., for plaintiff.
Frederick Drakesmith, St. Charles, Mo., for defendant.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court for a decision on the merits, after a trial to the Court, of plaintiff's two-count complaint. Count I of the complaint alleges a breach of contract; Count II alleges misrepresentation. After consideration of the testimony of the witnesses, the exhibits, and the stipulations of the parties, the Court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT
Plaintiff is a resident of the City of Collinsville, Illinois, and a citizen of the State of Illinois. Defendant Osage Homestead, Inc., d/b/a St. Charles Drilling Co., Inc., is a Missouri corporation with its principal place of business in St. Charles County, Missouri.
In November, 1974, plaintiff contacted the defendant to inquire about the possibility of defendant installing a well and water system on plaintiff's property in Illinois. Plaintiff's property consists in twenty acres located on Kosten Hill Road in Collinsville, Illinois, east of Illinois Highway 157. At the time, there were only two houses planned for construction on the property. The defendant's salesman Bob Torrance came to plaintiff's property and selected a site for the well; drilling began but a cave was encountered and that drilling site was abandoned.
Plaintiff agreed to a second drilling attempt. However, plaintiff wanted the water system which was to be installed with this well to have a capacity to serve twelve houses, as plaintiff had conceived the plan eventually to build ten more houses on his property. Plaintiff developed this plan in part because the second well and water system were to be much more costly than the first would have been, because the second well was to be dug at a considerable distance from plaintiff's property.
The estimate developed by defendant for the well and water system, in which 1¼" pipe was to be used, showed a total price of *531 $4,620.00. Plaintiff was told by Bob Torrance that to harness the capacity of the system to serve twelve houses, plaintiff would only need to: 1) replace the 2 h. p. pump, which was to be installed, with a 5 h. p. pump, and 2) install a 300 gallon tank in each additional home. On July 11, 1975, plaintiff and Bob Torrance executed an agreement for the installation by defendant of the well and water system. The agreement, plaintiff's Exhibit 9, was signed on plaintiff's Illinois property.
The agreement itself contained no description of the items which were to be included in the water system. It did show a maximum total price of $4,620.00 for the well and water system. Among the general terms and conditions contained in the agreement were a one-year guarantee on labor and parts, and the statement "[n]o agreements, expressed or implied, other than stated herein shall be considered as part of this contract." Next to the quoted statement was written "See Supplement Letter 7-11-75."
In the "supplement letter," dated July 11, 1975, plaintiff specified certain items which he wanted to be certain were part of the agreement; he would have allowed no work to be done by defendant on his property had the defendant not agreed to the terms in the "Supplement Letter." Defendant sent a letter to plaintiff, dated July 18, 1975, in which it confirmed the terms of the plaintiff's supplement letter; but defendant added a qualification. Part of defendant's letter to plaintiff, plaintiff's Exhibit 12, reads as follows: "1¼" pipe is large enough to supply 12 homes at 12 GPM each, total 144 GPM (30 # to 50 # pressure at houses); with proper sized pump and accumulator system." (Emphasis added). The underlined words or their equivalent were not contained in plaintiffs' supplement letter. Defendant's letter also confirmed plaintiff's understanding that the "[w]ater line [was] to be buried 36 inches deep."
The defendant, in adding the phrase "with proper sized pump and accumulator system" to its letter to plaintiff, meant to convey to plaintiff that he would have to purchase a 10,000 gallon tank for installation on top of his property to provide the level of service specified in the letter. However, the phrase "accumulator system" is ambiguous. It could refer either to a system of tanks or to a single large tank. Plaintiff understood it to refer to the 300 gallon tanks which Bob Torrance had told him it would be necessary to install in each additional house.
After receipt of this letter from defendant, plaintiff did not contact the defendant but he later allowed the work to proceed. Drilling began in late August, 1975, and the system was completed in early September, 1975. As installed, the system consisted basically in an 81' deep well with a 2 h. p. pump, a 42 gallon "float-type" squat tank, pressure controls near the well, approximately 2300' of 1¼" (inner diameter) PVC (plastic) pipe, and a 120 gallon tank in each of the two houses which had been constructed on plaintiff's property.
The well was drilled on the western side of Highway 157; plaintiff obtained an easement from the farmer who owned the property on which the well was dug, and the pipe was laid for approximately 1300' along the edge of the farmer's field to reach plaintiff's property. The two houses on plaintiff's property were located on top of a hill of 160'. This second well was not drilled where it was first staked by defendant because there were electrical wires too close to the staked site; plaintiff had to obtain a new easement for the well as eventually dug, and this caused plaintiff an additional expense of $175.00.
Plaintiff was ultimately billed for $4,778.39; the billing included certain authorized extra items. Plaintiff has paid the defendant the full amount billed.
The parties had agreed that the squat tank in the well, which was used to absorb pressure in the water system, was to be of the "bladder" type, in which the water is totally encased in a rubber sack. Plaintiff admitted that he has suffered no monetary loss from defendant's failure to install the bladder-type tank.
*532 The plastic pipe, which, according to the terms of the defendant's letter to plaintiff, was to be buried at a uniform depth of 36", was in fact buried at less than that depth at two points: 1) at the point of entry into plaintiff's house, and 2) at the drainage ditch alongside Highway 157. At the point where the pipe enters plaintiff's house, it is 24"-25" deep. The drainage ditch is 24" deep. (Plaintiff employed an independent company to drill beneath the highway and to lay an iron pipe under the highway; it was not a part of the plaintiff's agreement with defendant that defendant would drill under the highway.) The water entering plaintiff's house has never frozen, despite the less-than-36" depth of the pipe where it enters plaintiff's house.
The parties had agreed that there would be a 315 gallon tank installed in one of the two homes, instead of the two 120 gallon tanks which were installed. Although the tank could not have been installed in plaintiff's house because it could not have fit through the doors, it could have been installed in the other house. One 315 gallon tank would have cost $50.00 more than the two 120 gallon tanks.
The system did not function perfectly from the date of its installment, and defendant made numerous service calls to plaintiff's property in an attempt to correct the problems. Defendant has replaced the pressure controls at the squat tank four times. The squat tank operates at a significantly higher pressure than its rating.
The pump in the well short-cycled from the day of installation, but it has not been replaced. The short-cycling has since been rectified by plaintiff's installation of a time-delay, but this is only a temporary solution.
In February, 1977, the defendant, at no charge to the plaintiff, added a pump at each of the two houses. This has caused the pressure at plaintiff's house to be 30 # -50 #, as specified in the contract. Before the pump was installed, plaintiff had only approximately 16 # pressure.
In December, 1977, the pressure control valve located on a telegraph pole near the well, failed. The water tank in plaintiff's house burst. Plaintiff had to buy a new tank and a new pressure control valve which cost $388.25, and plaintiff spent 12 hours of his time installing them.
The system installed by defendant for the plaintiff does not have the capacity to provide, with a 300 gallon tank installed in each house and a 5 h. p. pump placed in the well, the service for twelve houses which is specified in defendant's letter to plaintiff. The 1¼" pipe could not withstand the pressure to which it would be subjected in supplying 144 gallons per minute, with 30 # to 50 # at each house. The system, if originally designed to provide a water supply of that magnitude, would have employed 3" pipe. However, the present system would have the capacity to supply 12 houses with the level of service specified in defendant's letter to plaintiff were a 10,000 gallon tank and a pump to be installed at the top of plaintiff's property. In 1975, such a tank would have cost $10,000.00.
Plaintiff did not attempt to establish what it would have cost, in 1975, to install a well and water system with 3" pipe which would have provided the desired level of service for 12 homes. Plaintiff did introduce evidence to show that, in 1975, to have converted the system installed by defendant into a 3" pipe system, it would have cost $14,693.65 and that at the time of trial this figure was $17,191.57. It was also established that 3" PVC pipe costs approximately five times as much per foot as 1¼" PVC pipe.

CONCLUSIONS OF LAW
This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332.
Applying the Missouri choice-of-law rules as required by Klaxon Co. v. Stentor Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), this Court concludes that Illinois law governs this action. The agreement of July 11 was signed in Illinois, plaintiff is a resident of Illinois, and performance occurred on plaintiff's property there. Thus, under the "most significant relationship" *533 test of the Restatement (Second) of Conflicts, applied by Missouri courts. Chmieleski v. City Products Corp., 71 F.R.D. 118, 169 (W.D.Mo.1976), Kennedy v. Dixon, 439 S.W.2d 173 (Mo.1969), Illinois law governs. Restatement (Second) of Conflict of Laws (1971) §§ 188, 196, 145, 148.
The parties have not addressed the possibility that the Uniform Commercial Code, as adopted by Illinois, governs this case. The Court has given strong consideration to that possibility, but has concluded that the contract at issue was primarily a service contract, with a sale of goods incidental thereto, rather than vice versa. See generally 1 Anderson, Uniform Commercial Code §§ 2-102:5 and 2-102:6 (1970 and Supp. 1979). At least one Illinois appellate court has adopted a "predominant factor in the contract" test, developed in Bonebrake v. Cox, 499 F.2d 951 (8th Cir. 1974), to determine the applicability of the U.C.C. Executive Centers of America, Inc. v. Bannon, 62 Ill.App.3d 738, 19 Ill.Dec. 700, 703, 379 N.E.2d 364, 367 (1978). Bonebrake v. Cox, supra, involved a contract to sell and install specified items of used equipment in a bowling alley that had been damaged by fire. The Court held that the contract fell within the (Iowa) Uniform Commercial Code, rejecting the decision below that because the contract was "mixed" (for goods and services), the U.C.C. did not govern. The Court held that the U.C.C. did apply because the items to be installed fell within the U.C.C.'s definition of "goods" and because the language of the contract was essentially that of a sales contract. The Court formulated the following general test of the U.C.C.'s applicability: "The test for inclusion or exclusion is not whether [contracts] are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e. g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e. g., installation of a water heater in a bathroom)." 499 F.2d at 960 (footnotes omitted). The Seventh Circuit, in a case governed by Illinois law, approved the Bonebrake test and held that a contract for the construction of a one-million-gallon water tank fell within the U.C.C. Pittsburgh-Des Moines Steel v. Brookhaven Manor Water Co., 532 F.2d 572 (7th Cir. 1976).
This Court finds that the transaction between the parties in the instant case falls on the "service" side of the Bonebrake test, for two reasons: with two exceptions discussed below, the parties had no agreement specifying the various component parts of the "water system" which were to be installed. The defendant was not bound to use specified items of "goods" in the water system. Neither party has suggested that the estimate sheet (plaintiff's Exhibit 8) prepared by defendant the day before the contract was signed, was a part of the parties' contract. Essentially, defendant undertook to install a "water system" of indefinite description but with a certain warranted capacity, rather than to install a detailed list of specific "goods." Therefore, not only was the contract essentially for defendant's services, but the component parts did not become identified to the contract until they were actually installed on plaintiff's property, and thus it is doubtful that they fell within the definition of "goods" contained in Ill.Rev.Stat., ch. 26, para. 2-105.
Secondly, the language of the instant contract is unmistakably that of service rather than of sale. Defendant is identified as the "contractor," and the contract acknowledges "an express mechanics lien ... to secure the amount of contract or repairs." Plaintiff's Exhibit 9, General Terms & Conditions no. 9.
Thus, the Court concludes that the U.C.C. does not, strictly speaking, govern this case. However, Illinois common law as to the measure of damages for breach of warranty has been held to be the same as that which was codified in the U.C.C.
It has long been the law in Illinois that the measure of damages for breach of warranty in the sale of goods is the difference between the actual value of the goods and the value if the goods were of *534 the quality warranted.... This is essentially the same formula which has been codified in the Uniform Commercial Code.... [T]he practical measure of damages in determining the difference between actual value and warranted value [is] the cost to repair the goods to the quality warranted. Modern commentators have accepted the same approach. (See, White and Summers, Uniform Commercial Code, at 308 (1972 Edition).)
Griese v. Cory Pools, Ltd., 58 Ill.App.3d 256, 15 Ill.Dec. 699, 702, 373 N.E.2d 1383, 1385 (1978) (citations omitted). Moreover, another Illinois appellate court has held (in a case governed by New York law) that Code policies are applicable "in reason" to matters which are not expressly within the U.C.C., such as a contract to waterproof certain material. Vitromar Piece Dye Wks. v. Lawrence of London, Ltd., 119 Ill.App.2d 301, 256 N.E.2d 135 (1969).
Turning to the facts of the instant case, the Court finds that the agreement signed by plaintiff and by Bob Torrance on July 11, 1975, and the defendant's letter to plaintiff, dated July 18, 1975, together comprised the written contract between the parties. Plaintiff accepted the terms in defendant's letter by allowing work to proceed after his receipt of the letter. Indeed, plaintiff's complaint is premised on the theory that defendant's letter formed a part of the parties' contract.
Although the agreement of July 11, 1975, contains the statement "[no] agreements, expressed or implied, other than stated herein shall be considered as part of this agreement," the document itself contains absolutely no description of the water system to be installed, and the defendant's letter provides only two or three particulars. Accordingly, consistent additional terms which were agreed upon by the parties may be considered to have been part of the contract. Air Conditioning Corporation v. Honaker, 296 Ill.App. 221, 16 N.E.2d 153 (1938); 3 A. Corbin, Contracts § 578 (1960 & Supp.1971).
The Court finds that the defendant breached the written and oral agreements between the parties in the following respects:
1) by failing to bury the pipe at a depth of 36" at two locations, as found above;
2) by failing to dig the well where it had originally been staked;
3) by installing two 120 gallon tanks instead of one 315 gallon tank;
4) by installing a "float-type" squat tank rather than a bladder-type tank; and
5) by failing to install a water system that, with the addition of a 300 gallon tank in each house and the installation of a 5 h. p. pump, had the physical capacity to provide 12 houses with 12 gallons per minute each, with 30 # to 50 # pressure at each house.
With respect to the last-mentioned breach, the Court finds that although the phrase "accumulator system" is ambiguous, the defendant had reason to know that plaintiff would interpret it as referring to the system of 300 gallon tanks to which defendant's salesman Bob Torrance had referred. Therefore, defendant is responsible for the plaintiff's interpretation of that phrase, even though defendant contends that the phrase meant a 10,000 gallon reservoir. 3 A. Corbin, Contracts § 537 (1960 & Supp. 1971); 17 Am.Jur.2d, Contracts, § 248; Restatement of Contracts § 71 and Comment a thereto (1932); United States v. Haas & Haynie Corp., 577 F.2d 568 (9th Cir. 1978). Moreover, it is well established that in case of ambiguity, an instrument is to be construed most strongly against its drafter. Id.; Cedar Park Cemetary Ass'n v. Village of Calumet Park, 398 Ill. 324, 75 N.E.2d 874, 879 (Ill.1947).
Turning to the issue of plaintiff's damages, the Court observes that the general rule for construction contracts is that when a contractor has performed substantially but has breached "his building agreement by failing to perform [precisely] as required by the specifications ... then [plaintiff is] entitled to recover the reasonable cost of correcting that default." Kusy v. Johnson, 41 Ill.App.3d 763, 354 N.E.2d *535 480 (1976); Litwin v. Timbercrest Estates, Inc., 37 Ill.App.3d 956, 347 N.E.2d 378 (1976). Plaintiff contends that under this rule, he is entitled to recover $17,879.82. This figure presumably represents the $17,191.57 which it would have cost as of the time of trial to convert the system installed by defendant into a new system using 3" pipe, plus the plaintiff's expenses for the repair job which plaintiff made in December, 1977.
It is clear that plaintiff's claim of damage, insofar as it arises from defendant's failure to install certain items as agreed upon, or in the manner agreed upon, is justified. The Court finds that defendant is entitled to recover $60.00 for the approximate expense of hiring a drilling company to bury the pipe at a depth of 36" at those two points where it is not now at that depth; $175.00 for defendant's failure to place the well where it was originally staked; and $50.00 for the failure to install a 315 gallon tank. However, plaintiff failed to show any damages from the installation of the float-type squat tank, and plaintiff also failed to show that the $388.25 expense he incurred in December, 1977, over two years after the system was installed, was due to any breach of contract by defendant.
Moreover, the Court cannot agree that plaintiff is entitled to recover $17,191.57 for the cost of converting the 1¼" pipe system to a 3" pipe system. The contract did not call for the installation of 3" pipe. It did guarantee that the pipe installed would have the capacity to provide a specified level of service to twelve homes. Plaintiff's understanding was that he could harness that capacity by making additional expenditures for a 300 gallon tank in each house and for a five h. p. pump. The evidence was that in 1975, a 300 gallon tank cost approximately $350.00. There was no evidence as to the cost of a 5 h. p. pump.
In fact, however, the system installed by the defendant would require, in order to have the warranted capacity, the addition of a 10,000 gallon tank, which in 1975 would have cost $10,000, and the purchase of an additional pump (of unknown h. p.). Therefore, the Court finds that plaintiff's damages due to the breach of warranty of capacity, the difference in value between the system as warranted and the system delivered, is $6,500.00. This figure does not include the cost of an additional pump, which would have been required in any case. Plaintiff's total damages on Count I, therefore, are $6,785.00.
Count II of plaintiff's complaint stated a claim for misrepresentation. The elements of such a claim are: a "(1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." Soules v. General Motors Corp., 79 Ill.2d 282, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (Ill.1980). The measure of damages for fraud in Illinois is the same as for breach of warranty:
A defrauded purchaser is entitled to damages which will give him the "benefit of his bargain." Thus, the measure of damages for fraudulently concealing the defects in property [or misrepresenting the capacity of the system] is the value the property would have had at the time of sale if the defect did not exist, less the value the property actually had at the time of sale due to the defects [or the value of the system with the warranted capacity less the value of the system with the actual capacity].
Posner v. Davis, 76 Ill.App.3d 638, 32 Ill. Dec. 186, 191, 395 N.E.2d 133, 138 (1979). Alternatively, the plaintiff may be entitled to the cost of repairing the property to make it conform to its represented condition. Id.
While the same actions by defendant may constitute both a tort and a breach of warranty, see W. Prosser, Handbook of the Law of Torts § 92 (4th ed. 1971), plaintiff may not have double recovery. While the prayer in Count II of plaintiff's complaint includes a request for punitive damages in the amount of $25,000.00, at trial plaintiff stated a prayer for $17,879.82, as *536 explained above. Accordingly, plaintiff may be considered to have abandoned his prayer for punitive damages. Alternatively, the Court finds that defendant's misrepresentation was not of such a nature as to warrant an award of punitive damages. "[P]unitive damages are improper, even in fraud cases, unless [the trier of fact can] permissibly find that the defendant acted willfully, wantonly, with malice, or in reckless disregard of the rights of others." Durant v. Surety Homes Corp., 582 F.2d 1081, 1087 (7th Cir. 1978) (applying Illinois law). None of these aggravating circumstances was present in the instant case. Accordingly, recovery will be denied on Count II.