527 A.2d 1316

**Homer DeGROFT**

v.

**LANCASTER SILO COMPANY, INC.**

**No. 1528, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

July 13, 1987.

156

Leonard J. Levine (Lisa Grosscup, on brief), Baltimore, for appellant.

Thomas A. Appel, Sykesville, for appellee.

Argued before MOYLAN, BLOOM and WENNER, JJ.

BLOOM, Judge.

In March, 1983, appellant, Homer DeGroft, filed suit in the Circuit Court for Carroll County against appellee, the Lancaster Silo Co., Inc., asserting causes of action for (Count 1) breach in 1975 of a written contract to construct a silo on his property; (Count 2) negligence in constructing the silo and preparing its footings; and (Count 3) breach of a subsequent oral contract to build a new silo after it became necessary to tear down the original one because it was unsafe.

Appellee moved for summary judgment as to all counts and, in September 1986, the court granted that motion. The court determined that the Uniform Commercial Code (UCC), Title 2 of the Md. Commercial Law Code Annotated, was applicable to the breach of contract claims because a sale of goods was involved. The first count was held to be barred because it was not filed within four years of the occurrence of the breach of the contract, as required by § 2–725 of the UCC; recovery under the third count was deemed to be unavailable because the oral agreement constituted a modification to the original contract for the sale of goods and, as such, was required by § 2–209 of the UCC to be in writing. Finally, the court determined appellee was entitled to judg-

ment as a matter of law as to the second count because the only injury appellant alleged he sustained as a result of appellee's negligence was economic and an action for pure commercial or economic loss resulting from negligence in performing a contract will not lie.

█ We agree with appellant that the court erred in granting summary judgment against him as to the first and third counts. We shall not address the question of the propriety of the grant of summary judgment on the second count (negligence) for the simple reason that appellant did not present or argue the issue in his brief. Rule 1046 f provides that "This Court may decline to *hear or consider* oral argument on any legal proposition or question of fact not presented in the briefs." (Emphasis added.) In *Pride Mark Realty, Inc. v. Mullins,* 30 Md.App. 497, 510, 352 A.2d 866, *cert. denied,* 278 Md. 730 (1976), we cautioned that we would "no longer indulge litigants by considering questions tangentially raised or mentioned in passing by brief *or* oral argument." (Emphasis in original.) We there held that when an issue, although raised below, is not raised on appeal, "we are as completely denied the right to review such question as if the appeal were premature or had not been taken at all." *Id.* at 511, 352 A.2d 866. *See also Hyde v. State,* 228 Md. 209, 218, 179 A.2d 421 (1962), *cert. denied,* 372 U.S. 945, 83 S.Ct. 938, 9 L.Ed.2d 970 (1963); *Comptroller of Treasury v. Aerial Products, Inc.,* 210 Md. 627, 644–45, 124 A.2d 805 (1956).

*Summary Judgment—Standard for Granting*

A grant of summary judgment is appropriate only where a two-fold test is met. The movant for summary judgment must clearly demonstrate the absence of any genuine issue of material fact and must also demonstrate that he is entitled to judgment as a matter of law. Md.Rule 2–501(a). *See also Dietz v. Moore,* 277 Md. 1, 4, 351 A.2d 428 (1976); *Castiglione v. The Johns Hopkins Hospital,* 69 Md.App. 325, 332, 517 A.2d 786 (1986); *Metropolitan Mortgage Fund, Inc. v. Basiliko,* 44 Md.App. 158, 162, 407 A.2d 773

(1979), *aff'd,* 288 Md. 25, 415 A.2d 25 (1980); *Vanhook v. Merchants Mutual Insurance Co.,* 22 Md.App. 22, 25, 321 A.2d 540 (1974). A fact is "material" if it somehow affects the outcome of the case. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985); *Lynx, Inc. v. Ordnance Products, Inc.,* 281 Md. 712, 717, 382 A.2d 555 (1978). The court, in ruling on a motion for summary judgment, must consider the pleadings, depositions, answers to interrogatories, admissions and affidavits submitted by the parties. Md. Rule 2–501(e).

At a hearing on a motion for summary judgment, the function of the judge is "much the same as that he performs at the close of all the evidence in a jury trial when motions for directed verdict ... require him to determine whether an issue requires resolution by a jury, or is to be decided by the court as a matter of law." *Vanhook, supra,* 22 Md.App. at 25, 321 A.2d 540 (quoting *Knisley v. Keller,* 11 Md.App. 269, 272–73, 273 A.2d 624, *(cert. denied,* 261 Md. 726 (1971)). The court does not attempt to decide any issue of fact or credibility, but only whether such issues exist. *Wolfe v. Lamar & Wallace, Inc.,* 261 Md. 174, 178, 274 A.2d 121 (1971); *White v. Friel,* 210 Md. 274, 285–86 123 A.2d 303 (1956). In ruling on a motion for summary judgment, all disputed facts and inferences therefrom should be viewed in the light most favorable to the party against whom the motion is made. *DiGrazia v. County Executive for Montgomery County,* 288 Md. 437, 445, 418 A.2d 1191 (1980); *Berkey v. Delia,* 287 Md. 302, 306, 413 A.2d 170 (1980); *Barb v. Wallace,* 45 Md.App. 271, 275, 412 A.2d 1314 (1980).

### Facts

The facts, viewed in the light most favorable to appellant, are as follows:

On June 5, 1975, the parties executed a one page, two-sided printed form contract labeled "Silo Construction Order." On the front of the form, the parties are referred to as

Lancaster Silo Co., Inc. and "landowner." Appellee was "authorized to construct a standard Lancaster silo" 30 feet by 80 feet in size on appellant's farm. Several of various boxes were checked off to indicate the "standard Lancaster silo accessories" with which the silo was "to be equipped," among them a distributor, chute, ladder and 31 redwood hinged doors. The silo was to be "delivered anytime" and "erected as soon as the [silo's] footing is in." The contract further specified that the "landowner agrees to pay [appellee] for such construction" a "total" of $17,256.00. No allocation between the cost of labor and materials is included. Spaces were provided to list the cost of the silo and other "items," but they were left blank.

The parties' signatures appeared at the bottom of the front side of the form, beneath a paragraph indicating the agreement constituted their "full and entire contract."

The other side of the form contract is headed "General Provisions." In several numbered paragraphs the parties are referred to as "Buyer" and "Seller." Paragraph 6 states in part that the "Seller assures the Buyer that the silo will be built within the average field practices of the National Silo Association and stands behind the materials and workmanship of the silo and associated equipment manufactured by [appellee] or its manufacturing agents."

Other paragraphs refer to the "construction" or "erection" of the silo (*e.g.*, Buyer's responsibility for "any unsafe condition on the construction site") and "materials" or "goods" (*e.g.*, "any sales tax upon the sale of goods ... shall be paid by the Buyer").

Attached to the contract, which was filed with the complaint as appellant's "Exhibit A," was a May 21, 1975, document prepared by W. Roger Roop on "Patz Material Handling Equipment" stationery entitled, "Estimate for Homer DeGroft." The cover page of that document contained the following:

Estimate for Homer DeGroft

| | |
|---|---:|
| 30 ft. by 80 ft. silo with aluminized steel roof, silo ladder, fill platform, multi flo silage spreader & 9 inch galvanized fill pile | $18,000.00 |
| 70 ft. stave chute @ $2.00 extra per ft. | 140.00 |
| 31–hinged redwood doors @ $5.00 each | 155.00 |
| 60 ft. safety cage @ $3.25 per ft. | 195.00 |
| Freight | 350.00 |
| Room & Board | 280.00 |
| | $19,120.00 |
| 5% discount, early order | 956.00 |
| | $18,164.00 |
| 5% discount with $15,000.00 with order | 908.00 |
| | $17,256.00 |

If you furnish two men for ground crew deduct $380.00. If you also furnish room & board deduct $280.00.

I come & lay out the lines for the footing, you dig the trench for footer. You furnish concrete for footer. Call me at the time concrete will be delivered and I will come and level it and smooth it. About 22 yds. of cement will be needed.

The rest of the May 21 document is immaterial; it merely referred to items of equipment not purchased by appellant. Also attached as a part of "Exhibit A" was an invoice listing at $17,256.00 the price of "30x80 Silo, Pipe and Dist."

Roop, allegedly an agent of appellee, did subsequently advise appellant on the size and type of footing needed for the silo, the amount of concrete required, and the pouring of the concrete. Additionally, he supervised the installation of the footing and leveled and smoothed the concrete. Appellee then erected the silo in the fall of 1975.

A few days after the silo was built, appellant noticed that several of the silo's hoops had ruptured. Appellee promptly, and to appellant's satisfaction, made repairs to the hoops.

Sometime in 1977, appellant's neighbors mentioned to him that the silo appeared to be off-center and "wasn't standing true."

During the next three or four years appellant contacted appellee's representatives on several occasions regarding the leaning of the silo. Representatives of appellee made several trips to view the silo. They assured appellant that there was nothing wrong with the silo and that it was sound. They further stated that "they would continue to watch it."

In late 1981 or early 1982, the leaning became more pronounced. An agent of appellee who observed the silo in August, 1982, noted that it was leaning dangerously. He orally promised appellant that Lancaster would build a new silo without cost to appellant if appellant would empty the existing silo and arrange to make a crane available to take the silo down. Appellee was to supervise the tearing down of the silo. Appellant, in reliance on this representation, emptied the silo. Appellee later refused to reconstruct the silo, alleging that its employee had only promised to repair the silo and that a windstorm which occurred that same month made it unsafe to attempt to repair the silo. The silo was ultimately dismantled by appellant under the supervision of appellee's employees. After the silo was taken down, appellant was able to see cracks in the concrete footing and observe that the silo had not been properly centered on the footing. Appellant claimed that he suffered damages in the amount of $75,000.

Additional facts relevant to the legal issues presented herein will be incorporated below.

### The Written Contract

The initial question presented is whether the trial court erred in ruling that the Uniform Commercial Code was applicable to appellant's claim for breach of the 1975 written contract. If the UCC governs, appellant's claim would be barred under § 2–725(1), which requires that an action for "breach of any contract for sale must be commenced within four years after the cause of action has accrued." Section 2–725(2) provides that "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's

lack of knowledge of the breach." [1]   In the instant case, any breach of the written contract had to have occurred in 1975, some eight years before the action was filed.

On the other hand, if the UCC is inapplicable, the three-year statute of limitations in § 5–101 of the Md. Courts and Judicial Proceedings Code Annotated would govern. Whether appellant's claim for breach of the 1975 contract would be barred by § 5–101 would then depend on when appellant had sufficient knowledge of the wrong to trigger the running of the statute under the "discovery rule" announced in *Poffenberger v. Risser,* 290 Md. 631, 637–38, 431 A.2d 677 (1981).

Section 2–102 of the UCC provides that "[u]nless the context otherwise requires," the UCC applies to "transactions in goods," a term which has been said to be broader than the sale of goods. *Burton v. Artery Co., Inc.,* 279 Md. 94, 113, 367 A.2d 935 (1977).  For purposes of the UCC, and with certain exclusions not here relevant, "goods" means "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale...." § 2–105(1); *Burton, supra,* 279 Md. at 97, 367 A.2d 935.

In the absence of an explicit agreement, "identification" of goods occurs "when the contract is made if it is for sale of goods already existing and identified." § 2–501(1)(a).  If the contract is for the sale of future goods, that is, goods which are not both existing and identified, § 2–105(2), identification occurs when the "goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers." § 2–501(1)(b).

---

**1.** Where a breach of warranty occurs and the "warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." § 2–725(2).  Appellant has not contended appellee breached any explicit warranty extending to the *future* performance of goods which would extend the date of the breach's occurrence to the date of discovery.

The UCC does not apply to service contracts or to materials used or supplied in connection with the performance of such contracts. *Burton, supra,* 279 Md. at 102, 367 A.2d 935; R. Anderson, *Uniform Commercial Code,* § 2-105:34 (1981 & 1986 Supp.).

Between the contract for the sale of goods and the service contract is the "hybrid" or mixed sales and service contract. The test to determine whether the UCC applies to mixed sales and service contracts

> is not whether they are mixed, but, granting that they are mixed, *whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service,* with goods incidentally involved (*e.g.,* contract with artist for painting) or is a transaction of sale, with labor incidentally involved (*e.g.,* installation of a water heater in a bathroom).

*Burton,* 279 Md. at 108–09, 367 A.2d 935 (quoting *Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974)). *See also Snyder v. Herbert Greenbaum and Associates, Inc.,* 38 Md.App. 144, 147, 380 A.2d 618 (1977).

In its memorandum in support of its motion for summary judgment, appellee contended that the UCC was applicable because the 1975 contract was one to "purchase a silo." The items or accessories for the silo, it contended, were "movable at the time of identification which occurs before the equipment is installed." It also urged the silo proper was "identified long before its installation in the fall of 1975, and, therefore, was movable at the time of the contract for its purchase and at the time of identification."

In later pleadings, appellee contended that the silo was "completely pre-fabricated and all parts readily identifiable from what Lancaster Silo sold as a 'kit.'" The "pre-fabricated parts were identifiable as a silo before construction as well as after construction," it asserted.

In opposing the motion, appellant contended that the UCC was inapplicable in that a "service" contract for "construction" was clearly involved. Moreover, appellant argued, the

silo did not fall within the statutory definition for "goods" because it did not come into existence until fully constructed.

In granting summary judgment, the trial court found that the parties' contract was a mixed sales and service contract, but did not specify which of the materials provided in connection with the contract were goods and at what point they could be considered to have been identified. The court also accepted appellee's characterization of the transaction involving the silo as the "sale of a kit" with the construction incidentally involved.

■ We note initially that it was error, on either of two grounds, for the court to base summary judgment in any part on appellee's averments in unverified pleadings that it sold appellant a silo "kit" or to assume the truth of appellee's assertions that the component parts and accessories were movable, existing and identified at the time of execution of the contract.

Under Md. Rule 2–501, whenever a motion for summary judgment is based on facts not contained in the record or papers on file it *must* be supported by an affidavit properly executed in accordance with Rule 2–501(c). *See* P. Niemeyer & L. Richards, *Maryland Rules Commentary*, Rule 2–501 (1984). *See also* Md. Rule 2–311(d). At the time of appellee's motion, none of the materials of record indicated the silo was sold as a kit or that it was comprised of pre-fabricated components which were movable and identified at the time of the contract.

Appellee, therefore, was required to submit an affidavit attesting to those facts but failed to do so. If the court did not properly have before it the facts necessary to determine whether and when any of the subject matter of the contract could be considered "goods," it could hardly determine, as a matter of law, that the UCC was applicable to the 1975 contract.

■ Moreover, appellant disputed the assertion that a "kit" was sold; in his pleadings he noted that it would be

"absurd to say that Lancaster sold staves and hoops to [him] and just merely put them up as an afterthought." In that respect alone, there was a genuine dispute as to a material fact precluding summary judgment.

■ Even if the contract were, as contended by appellee, one for the sale of a silo "kit" to be assembled by the vendor,[2] summary judgment would have been inappropriate because, in such case, the 1975 contract would have been a "hybrid" contract involving goods and services. Applicability of the UCC, then, would hinge on the main purpose or primary thrust of the parties' agreement. *See Chlan v. KDI Sylvan Pools, Inc.*, 53 Md.App. 236, 240, 452 A.2d 1259 (1982), and cases cited therein. *See also KLSA–TV, Inc. v. Radio Corporation of America*, 501 F.Supp. 891, 893–94 (D.La.1980), *aff'd*, 732 F.2d 441 (5th Cir.1984).

There is a relative paucity of law in Maryland involving application of the "predominant purpose" test. *See e.g. Burton, supra*, 279 Md. at 114–15, 367 A.2d 935 (UCC applicable to contract for sale and installation of a substantial number of trees and shrubs); *Chlan, supra*, 53 Md. App. at 240–41, 452 A.2d 1259 (contract for sale and installa-

---

2. Silos and similar structures have been considered "goods" under § 2–105 by several courts. *Clevenger and Wright Co. v. A.O. Smith Harvestore Products, Inc.*, 625 S.W.2d 906, 908 (Mo.1981) (silo assumed, without discussion, to be "goods"); *Thompson Farms, Inc. v. Corno Feed Products, Inc.*, 173 Ind.App. 682, 366 N.E.2d 3, 14–15 (1977) (livestock confinement building); *Dowling v. Southwestern Porcelain, Inc.*, 237 Kan. 536, 701 P.2d 954, 959 (1985) (silo assumed to be goods for purposes of appeal); *Meeker v. Hamilton Grain Elevator Co.*, 110 Ill.App.3d 668, 66 Ill.Dec. 360, 442 N.E.2d 921, 923 (1982) (grain bins requiring assembly); *but cf. Northern Farm Supply, Inc. v. Sprecher*, 307 N.W.2d 870, 874 (S.D.1981) (livestock confinement buildings not "goods"). There is also considerable authority for the proposition that large items assembled from identified, pre-fabricated component parts such as modular homes, water tanks, and bowling lanes constituted "goods." *See Cates v. Morgan Portable Building Corporation*, 591 F.2d 17, 20 (7th Cir.1979); *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 580 (7th Cir.1976); *Bonebrake, supra*, 499 F.2d at 958 n. 12; *Gulf Coast Fabricators, Inc. v. Mosley*, 439 So.2d 36, 38 (Ala.1983); *Little v. Grizzly Manufacturing*, 195 Mont. 419, 636 P.2d 839, 842 (1981).

tion of a cement pool not governed by UCC); *Snyder, supra,* 38 Md.App. at 147–48, 380 A.2d 618 (contract to furnish and install over 17,000 yards of carpet in 228 apartments was predominantly a sale of goods, and UCC governed). *But cf. Anthony Pools, Inc. v. Sheehan,* 295 Md. 285, 297–98 455 A.2d 434 (1983) (UCC warranties may apply to consumer goods notwithstanding fact "hybrid" contract is predominantly one for rendering services; gravamen test, rather than predominant purpose test, governs).

Courts have generally looked principally to the language of the parties' agreement and the circumstances surrounding its making in determining the predominant thrust of the of the transaction. *Coakley & Williams, Inc. v. Shatterproof Glass Corporation,* 706 F.2d 456, 460–62 (4th Cir. 1983), *cert. denied,* 475 U.S. 1121, 106 S.Ct. 1640, 90 L.Ed.2d 185 (1986) (applying Maryland law); *Bonebrake, supra,* 499 F.2d at 957–58; *Osterholt v. St. Charles Drilling Co.,* 500 F.Supp. 529, 531–33 (E.D.Mo.1980); *Lincoln Pulp & Paper Co., Inc. v. Dravo Corp.,* 436 F.Supp. 262, 275 (N.D. Maine, 1977); *Colorado Carpet Installation, Inc. v. Palermo,* 647 P.2d 686, 688 (Colo.1982), *aff'd,* 668 P.2d 1384 (1983); *Gulash v. Stylarama,* 33 Conn.Supp. 108, 364 A.2d 1221, 1223 (1975); *Baker v. Compton,* 455 N.E.2d 382, 386–87 (Ind. 1983).

■ In analyzing the parties' agreement, it is appropriate to look to the terminology used therein to determine whether it is peculiar to sales or service contracts. *See e.g., Bonebrake, supra,* 499 F.2d at 957–58 (repeated reference to and listing of "equipment" and language warranting equipment was "free from defects" peculiar to sales contracts); *Gulash, supra,* 369 A.2d at 1223 (UCC did not apply where transaction described as a furnishing of labor and materials, and did not label agreement a sale).

The courts also consider it significant whether the parties' agreement specifies any allocation between the costs of materials and services and the relative costs of the goods to the total contract price. *Aluminum Company of America*

*v. Electric Flo Corporation,* 451 F.2d 1115, 1118 (10th Cir.1971) (UCC applied where total charge was for materials furnished); *Lincoln Pulp, supra,* 436 F.Supp. at 275 (absence of allocation between labor and materials factor in determining UCC did not apply); *Colorado Carpet, supra,* 647 P.2d at 688 (UCC applied where major portion of contract price was price of the goods); *Gulash, supra,* 364 A.2d at 1273 (absence of any allocation between labor and materials factor in determining UCC did not apply); *Baker, supra,* 455 N.E.2d at 386 (UCC applied where cost of equipment represented majority of total contract price). The failure of the parties to specify in their agreement the various component parts to be used in building a large item or system has also been considered a factor. *Osterholt, supra,* 500 F.Supp. at 533. More rarely, the courts will give consideration to whether the cause of action centers exclusively on the defective nature of the goods or on unsatisfactory service performance, *Glover School & Office Equipment, Inc. v. Dave Hall, Inc.,* 372 A.2d 221, 223 (Del.1977); *Baker, supra,* 455 N.E.2d at 382; *H. Hirshfield Sons, Co.,* 107 Mich.App. 720, 309 N.W.2d 714, 717 (1981), and to the nature of the business of the supplier. *Coakley, supra,* 706 F.2d at 460; *Ranger Construction Co. v. Dixie Flour Co.,* 433 F.Supp. 442, 445 (D.S.C.1977).

■ It is pellucid that when the facts presented below and the inferences deducible therefrom are considered in the light most favorable to appellant, a factfinder could reasonably conclude that the contract between appellant and appellee predominantly concerned the rendition of services.

Pursuant to the contract proper, appellee was authorized to "construct" a silo, and repeated references to its "construction" or "erection" are contained therein. The contract does not refer to the "sale" or "purchase" of a silo. While the contract does mention certain "accessories" with which the silo was to be "equipped," it does not refer to the principal subject of the contract—the silo—as equipment, nor does it specify the component parts of the silo itself.

Neither the contract nor the exhibited estimate or invoice indicate how much of the "total" contract price of $17,256 represented the cost of labor versus materials. Finally, the exclusive thrust of appellant's claim against appellee respects the improper rendition of construction services.

There are, on the other hand, certain aspects of the parties' agreement which would tend to place it on the "goods" side. The contract contains some provisions peculiar to "goods" transactions in that it refers, at times, to the parties as "Buyer" and "Seller" and contains a warranty respecting defects in the materials and workmanship of the silo.

At first glance, it would appear from the language of the contract itself that its main thrust, at least from appellant's standpoint, was construction of a silo and not the sale of the component parts and accessories. Possibly, in appellee's contemplation, it was for the sale of goods. It may even be that the bulk of the price was for the parts rather than the assembly. We simply cannot tell from the existing record. Furthermore, the record reveals little about the overall nature of appellee's business and its relationship to "Patz Handling Equipment."

Other courts have been reluctant to affirm the grant of summary judgment where a hybrid sales and service contract is involved because they view the determination of the predominant purpose of a transaction as a question of fact. *See Prince v. Spire Corporation*, 584 S.W.2d 108, 111 (E.D.Mo.1979); Anderson, *Uniform Commercial Code*, § 2–105:51 (1981 & 1986 Supp.). And while we can conceive of situations in which the predominant purpose of the transaction might be properly resolved as a matter of law, that was not the case here.

### *Limitations*

While the trial judge erred in dismissing appellant's action on the basis it was time-barred under the UCC, we may nevertheless affirm its decision if appellant's action would

be barred under the statute of limitations governing other contract actions.

Md. Courts and Judicial Proceedings Code Annotated, § 5–101, provides that "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." In that there is no other applicable Code provision, § 5–101 governs common law contract actions.[3] *Mayor and Council of Federalsburg v. Allied Contractors, Inc.*, 275 Md. 151, 157, 338 A.2d 275, *cert. denied*, 423 U.S. 1017, 96 S.Ct. 452, 46 L.Ed.2d 389 (1975); *Antigua Condominium Association v. Melba Investors Atlantic, Inc.*, 65 Md.App. 726, 748, 501 A.2d. 1359, *aff'd in part, rev'd in part*, 307 Md. 700, 517 A.2d 75 (1986).

Until *Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677 (1981), a cause of action was said to "accrue" under § 5–101 when the alleged wrong occurred. In that decision, however, the Court of Appeals adopted a "discovery rule," providing that a cause of action cannot be deemed to accrue until an aggrieved party knew, or reasonably should have known, of the wrong committed. 290 Md. at 637–38, 431 A.2d 677. This discovery rule is applicable to common law contract actions. *Yingling v. Phillips*, 65 Md.App. 451, 460–61, 501 A.2d 87 (1985).

Under the discovery rule, it is not necessary that a party have knowledge of all the details of his cause of action for that cause of action to accrue; it is enough that he have actual knowledge of facts sufficient to put an ordinarily prudent person on inquiry, thus charging him " 'with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.' " *Poffenberger, supra*, 290 Md. at 637, 431 A.2d 677 (quoting *Fertitta v. Bay Shore Development Corpora-*

---

3. Section 5–102(a)(6) establishes a twelve year period of limitations for contracts under *seal,* however.

*tion,* 252 Md. 393, 402, 250 A.2d 69 (1969)). *See also Lutheran Hospital of Maryland v. Levy,* 60 Md.App. 227, 237, 482 A.2d 23 (1984), *cert. denied,* 302 Md. 288, 487 A.2d 292 (1985).

In two recent decisions, the Court of Appeals has discussed the application of the "discovery rule" in the context of motions for summary judgment. In *O'Hara v. Kovens,* 305 Md. 280, 296–97, 503 A.2d 1313 (1986), the Court expressly overruled prior decisions indicating that the determination when a cause of action accrues is strictly a legal question which is always to be resolved by the judge acting in his judicial rule. In reversing the trial judge's grant of summary judgment in a fraud action, the Court assumed, without deciding, that there was no dispute of material primary fact and noted:

> From the primary facts some tribunal must deduce when the plaintiffs were on notice. That ultimate fact is ordinarily a question for the trier of facts going to the merits. "[W]hether or not the plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence, or to the fact that defendant so concealed the wrong that plaintiff was unable to discover it by the exercise of due diligence, is ordinarily a question of fact for the jury."

*Id.* at 294, 503 A.2d 1313 (quoting *New England Mutual Life Insurance Co. v. Swain,* 100 Md. 558, 574, 60 A. 469 (1905)).

In *Baysinger v. Schmid Products Company,* 307 Md. 361, 367–68, 514 A.2d 1 (1986), a products liability action, the Court, citing *O'Hara,* held that summary judgment was inappropriate to resolve the limitations issue. The plaintiff in that case filed suit in 1984 against the manufacturer of an intrauterine device. She had been hospitalized in 1979, at which time the device was removed. Also in 1979, she consulted physicians respecting the cause of her illness, but they could not unequivocally state that the coil device was

responsible and indicated that there might be several causes.

The Court of Appeals disagreed with the trial court's determination that as a matter of law the appellant had notice of her cause of action in 1979 because she then entertained some suspicions her problems might be related to the intrauterine device. *Id.* at 367, 514 A.2d 1. The Court noted that notwithstanding such suspicions, "there is no evidence that she then suspected, or reasonably should have suspected, wrongdoing on the part of anyone. Whether a reasonably prudent person should then have undertaken a further investigation is a matter about which reasonable minds could differ...." *Id.* at 367, 514 A.2d 1.

In the case *sub judice*, appellee has contended appellant had actual knowledge of the alleged breach of contract in 1977 when neighbors informed him the silo was leaning. Appellee argues that appellant's repeated calls to Lancaster Silo's agents indicated his awareness of appellee's responsibility for the wrong. Appellant, on the other hand, contends that, since he received repeated assurances from appellee for several years that the silo was sound, he did not have actual knowledge of the wrong committed by appellee until 1982, when he learned, after the silo was dismantled, that the concrete footing was cracked and that the silo had been improperly constructed.

We do not agree with appellee's position. The mere fact appellant knew the silo was leaning in 1977 does not, of necessity, establish that he was aware that a wrong had occurred, nor does the fact he made calls to appellee necessarily indicate he knew appellee was responsible for that wrong.[4]

---

4. In *Booth Glass v. Huntingfield Corporation,* 304 Md. 615, 625, 500 A.2d 641 (1985), the Court of Appeals held the trial judge had properly granted Booth's motion to dismiss Huntington Field's negligence and contract actions at the conclusion of the trial. The Court determined the actions were time-barred under § 5–101, as a matter of law, because it was undisputed Huntington Field knew more than 3 years before the claims were brought that certain exterior "glasswork was

In his deposition, appellant had the following to say about his neighbors' comments in 1977:

> [D]ifferent neighbors would say to me, your silo, there is something wrong with it, Homer. Well, you kind of just don't know whether you should believe them or not, and you look at it, and you just wonder, you know.

Although the above passage indicates appellant was uncertain anything was wrong with his silo, nevertheless, he called appellee to express "concern" about the leaning. The calls to appellee might raise an inference appellant considered appellee to be responsible for the silo's leaning, but it is equally possible he called appellee for advice as to whether there was, in fact, anything wrong with the silo or, perhaps, merely for assurance that nothing was wrong. In his deposition, appellant said, "I called them a time or so to tell them they better check this thing, it looks like it's leaning."

Appellee's agents, the experts called upon to advise or reassure appellant, then informed appellant that nothing was wrong with the silo. Appellant, not being an expert in such matters, might well have assumed that the leaning was insignificant, within normal or acceptable limits, or due to some cause other than fault on the part of appellee, such as ground shifting or the manner of silage storage.

The facts indicate nothing whatsoever about the nature or extent of the leaning in 1977, *i.e.,* whether it was significant or slight, whether obvious or only perceptible from a distance. Nor does the record reveal whether the leaning grew gradually and progressively more severe until

---

leaking and therefore was upon notice Booth may have been negligent." *Id.* at 621, 500 A.2d 641. The situation in *Booth,* however, is a far cry from the case *sub judice.* In *Booth,* there was evidence the exterior glass "leaked like a sieve" two weeks after it was installed. It was also clear from the evidence that Huntington Field not only suspected wrongdoing, but that it believed Booth was responsible for the wrong. For a period of two years Booth actually attempted to repair the glass. *Id.* at 617, 621, 500 A.2d 641. Booth made no assurances or representations that there was nothing wrong with the glasswork.

1982, when it concededly leaned drastically, or whether it remained fairly stable and then suddenly and dramatically shifted in 1982. We must assume the latter because the facts and the inferences drawable therefrom are to be viewed in the light most favorable to appellant.

It may be that an ordinary and prudent person in appellant's position would have disregarded appellee's assurances that nothing was wrong with the silo and would have undertaken further investigation. And it may be that the nature or extent of the leaning in 1977 or at some point thereafter was so marked that an ordinary and prudent person would have concluded that some fault on the part of appellee might have been the cause of the leaning.

But these were matters for the trier of fact to determine on a record more ample than that before the court on the summary judgment motion. As in *Baysinger, supra,* the evidence presented was simply inadequate to indicate that in 1977 appellant *"then* suspected, or reasonably should have suspected *wrongdoing* on the part of anyone," 307 Md. at 367, 514 A.2d 1 (emphasis added), or to allow us to conclude, as a matter of law, that an ordinary, prudent person would have conducted further investigation.

### The Oral Promise to Build a New Silo

Because we have already decided that the circuit court erred in ruling that the UCC was applicable as a matter of law to appellant's 1975 contract claim, it follows that it was error to bar his claim for breach of the 1982 oral promise to build a new silo on the ground that the oral promise was a modification of a contract for the sale of goods and thus required by § 2–209 of the UCC to be in writing.

Nor do we accept appellee's contention that the claim would nevertheless be unenforceable for lack of consideration. Contrary to its contention, appellant's undertaking to empty the silo and take it down constituted legally sufficient consideration for appellee's promise to recon-

struct the silo. Nor, as appellee contends, does the agreement come within the Statute of Frauds in respect to real property. Md. Real Prop.Code Ann., Title 5, §§ 5–105—5–108. The oral contract was not one for the purchase or sale of land or any interest concerning land; it was an agreement to contruct a structure upon land, as to which the Statute of Frauds is inapplicable. *Bruns v. Spalding,* 90 Md. 349, 361, 45 A. 194 (1900).

JUDGMENT AFFIRMED AS TO SECOND COUNT, REVERSED AS TO FIRST AND THIRD COUNTS.

COSTS TO BE PAID BY APPELLEE.