CONOPCO, INC., Plaintiff,

v.

John T. McCREADIE, an individual as a representative of a class comprised of all partners in the general partnership doing business as Ernst & Young, Defendants.

Civ. A. No. 90–2298(MTB).

United States District Court, D. New Jersey.

July 12, 1993.

---

Carpenter, Bennett & Morrissey by Michael S. Waters, Newark, NJ and Cadwalader, Wickersham & Taft by H. Peter Haveles, Jr. and Steven G. Brody, New York City, for plaintiff.

Ernst & Young by Melissa Zelen Neier, Herbert J. Sue, and Karen Y. Bitar, Office of the Gen. Counsel, New York City, for defendants.

### OPINION

BARRY, District Judge.

#### I.  Introduction

Plaintiff, Conopco, Inc., has sued the partners of Ernst & Young ("E & Y")[1] alleging breach of contract, professional negligence and malpractice, and breach of the implied warranty of fitness for use under the Uniform Commercial Code ("UCC") in connec-

1.  Although the defendants in this action are the partners of Ernst & Young, for convenience the court will refer to the defendants as "E & Y".

tion with a computer management consulting agreement between Faberge, Inc. ("Faberge") and E & Y, which agreement was subsequently assigned by Faberge to Conopco's parent, Unilever United States, Inc. ("Unilever"). E & Y now moves for summary judgment on all three counts of the complaint. For the reasons which follow, E & Y's motion will be granted in part and denied in part.

## II. Factual Background

This action revolves around the computer support systems of the Elizabeth Arden Company ("Arden"). Arden is in the business of manufacturing, distributing, and selling cosmetics and fragrances under various names in the United States and Europe. At all relevant times, Arden maintained manufacturing or distribution facilities in the United States, England, and Italy and had affiliates with offices in Austria, France, the United Kingdom, Switzerland, and Germany. Arden's sales personnel took orders for Arden cosmetics and fragrances, typically for different quantities of various items, which were entered in a computer system. The orders were transmitted to a distribution center, where the products ordered were packed for shipment. At the distribution center, the computer system generated invoices and shipping documents for orders. In addition, Arden used the computer system for generating customer invoices, monitoring the receipt of payments from customers, and maintaining inventory levels. The various systems in use throughout Arden in both the United States and Europe totalled over 150.

In December, 1987, Faberge acquired Arden from Eli Lilly and Company ("Lilly"). In connection with the sale of Arden, Faberge and Lilly entered into an agreement under which Lilly would continue to provide Arden with computer services for eighteen months after the sale, until June 22, 1989, at which point Arden would have to "migrate" off Lilly's system. In anticipation of the Arden acquisition and the date by which Arden would have to be off the Lilly computer system, Faberge retained E & Y in September, 1987 to conduct a strategic assessment of the options open to Arden with respect to its computer system.

### A. Assessment

The terms of the initial engagement of E & Y were set forth in a letter dated September 8, 1987. The letter, sent by E & Y to James E. Treanor, Director of Corporate Services at Arden, and Charles W. Callahan, Director of Management Information Systems ("MIS") Worldwide, at Faberge, began "This letter will confirm our understanding of the management consulting services you requested to assist [Arden] in the migration of information services from [Lilly]." Affirmation of Herbert J. Sue, dated April 27, 1992 (hereinafter "Sue Aff."), Exh. 3 at 1. It further stated that

> Ernst & Whinney will act as Arden's Project Manager for the migration project. In this capacity, we will serve as facilitators and implementors of the recommended information systems strategy, and work with Arden, Faberge, and Lilly personnel world-wide to accomplish the migration effort with maximum speed, technical accuracy and minimal disruption to Arden.

*Id.* at 3.[2] In addition, the letter laid out a five-stage process according to which the project would proceed. Stages I and II, Situation Assessment and Strategy Development, were expected to be completed within four calendar months of the date of the letter. A new letter agreement was to be submitted before Stages III, IV, and V, Migration Activity, Custom/Package Implementation, and Long–Range Planning, respectively, would begin.

As a result of its assessment, E & Y identified three alternative courses of action with respect to the Arden computer systems. These options are set forth both in an outline prepared during the course of the assessment, in November, 1987, and in a report presented to Faberge management on February 4, 1988. One option was to copy the Lilly software for Arden such that the applications would remain the same. This option

---

**2.** Ernst & Young is the successor to Ernst & Whinney. Any differences between the two entities are immaterial for purposes of this action; accordingly, the entities will be referred to interchangeably as "E & Y".

was given little consideration. Another alternative was to use a third-party computer service bureau for approximately two years while new computer systems were developed for Arden. This plan was followed by a reference of "(insurance)" in the November outline and recommended by E & Y in the February 4, 1988 report as having the best fit vis-a-vis the project objectives and the least risk to the ongoing business. The third option was to immediately develop and implement new computer systems at Arden prior to the June 22, 1989 "drop dead" date set by Lilly. This plan, followed by a reference of "(Star Wars)" in the November outline, was rated by E & Y as the highest risk alternative of the three.

In a graphic which listed seven potential problems associated with the Arden computer systems project, the risk associated with the completely new systems option rated an "H" (High) for five of the seven possible pitfalls: disruption to the business—quality of system support; disruption to the business—loss of system features; conversion of Faberge system may not be complete within 16 months; converted unique applications (Demo) may not be ready in 16 months; and technical staffing will not be accomplished in required time frame. Sue Aff., Exh. 4. By comparison, the third-party service bureau option was deemed highly risky with respect to only one problem: ability to contain costs. *Id.* With respect to the new systems option, Conopco further points to an E & Y document dated January, 1987 which states as a key strategy issue "Time required to implement a consolidated Arden/Faberge systems environment will exceed 18 month Lilly service agreement." Haveles Aff., Exh. 41.

Faberge's chairman, Daniel Manella, rejected outright E & Y's recommendation at the February 4, 1988 meeting that a third-party service bureau be used while new systems were developed and implemented because the cost of that alternative was too high. Several weeks after that presentation, following another meeting between E & Y and Faberge management at which E & Y presented another analysis of the third-party service bureau and new systems options, Faberge elected to follow the lower cost, higher

risk alternative of developing and implementing new systems at Arden prior to the June, 1989 cutoff. Significantly, the parties differ in their characterizations of how this decision was reached.

Conopco claims that E & Y, having had its initial recommendation rejected, did a complete about face and recommended the option which called for the development of new computer systems at Arden before the Lilly cutoff date. As evidence of this, Conopco points to a document entitled "Arden MIS Proposal" submitted by E & Y to Faberge management. This report sets forth the three available options and discusses the costs and benefits associated with each. The report then makes a recommendation:

> In evaluating systems migration alternatives, we looked at issues of risk and cost. The risks are primarily focused on the amount of time available to implement new systems and the potential for business disruption in an extended Lilly service relationship. The alternatives that offer substantial risk reduction (third party alternative) by providing early exit from Lilly demonstrate that the cost to migrate these risks is substantial. However, we believe that several factors work to offset them particularly the assumption that there is a reasonably good fit between Arden's systems needs and Faberge's existing ASI computer systems. Accordingly, we recommend that a least cost, higher risk approach be followed in the systems migration from Lilly.

Sue Aff., Exh. 6 at EY16.

E & Y, on the other hand, contends that Faberge reached the decision to develop and implement new systems at Arden prior to the Lilly cutoff date on its own. E & Y cites the deposition testimony of Patrick DeMartino, Faberge's Director of Management Information Systems for the United States, as support for that contention. DeMartino testified that following Manella's February 4, 1988 rejection of the third-party service bureau approach advocated by E & Y and supported by DeMartino's superior, Charles Callahan, he and Callahan decided that the new systems option should be followed and implemented by using American Software, Inc.

("ASI") software for the manufacturing and distribution systems in the United States and Europe as well as for the financial systems in the United States and the United Kingdom. This decision was based largely on the fact that Faberge had recently implemented new systems for its own business using ASI software and its personnel, therefore, had experience and familiarity with it.

### B. Implementation

The parties do not dispute that Faberge made the decision to use ASI software in the new Arden systems. The deposition testimony of both Callahan and DeMartino of Faberge indicates that Faberge's senior management felt comfortable with ASI software because of the company's previous experience with it and because Faberge had applied it to a reasonably related business, i.e. cosmetics and health and beauty aids. E & Y was not asked to and did not perform any studies to test the validity of Faberge's assumption that ASI software systems would fit the business needs of Arden. Faberge thereafter acquired approximately twenty different software modules from ASI for use at Arden.

With respect to the computer hardware, E & Y recommended an IBM 4381 computer for Arden. E & Y did not perform any review as to whether that machine had enough processing power to handle the throughput demands of the Arden system, and Faberge relied on its experience in connection with the updating of its own computers to judge how powerful a processor was needed. Further complicating the estimation of Arden's power needs was the fact that the conversion was being done from the Lilly system to a totally new and different system. The computer hardware lease agreements were structured to permit flexibility to upgrade the system if necessary.

In May, 1988, E & Y sent Faberge a second engagement letter. This letter set forth several projects which E & Y was to perform, including the objective, scope, approach, "deliverables," timing, and estimated fees for each. The tasks outlined in this letter were (1) Export Systems Project—U.S. (design and implement a uniform system to support Arden's export business with direct interface with the ASI software to be used for manufacturing and distribution); (2) Demonstration Systems Project (implement a system to process payments to Arden employees who demonstrate products to customers in department stores); (3) Sales Reporting Project—U.S. (design a method to use Faberge's existing sales analysis and reporting systems to provide Arden sales analysis information); (4) European Manufacturing/Order Processing Systems Project (replace the manufacturing, order processing, and distribution systems for Arden and Faberge sites in Europe); (5) Sales Reporting Project—Europe (implement a new sales reporting system to support Arden and Faberge businesses in Europe); (6) Environmental Design—Europe (design, construction management, and hardware installation for new data centers in Europe); (7) Telecommunications Assistance (design and implement data communications networks in the U.S. and Europe); (8) Staffing—Europe (identify position descriptions, develop a staffing plan, and assist in hiring personnel for the data center); and (9) Project Coordination—Europe (provide overall project control for E & Y and local resources throughout Europe). Sue Aff., Exh. 9.

It is undisputed that E & Y was requested to and did work beyond the scope of the projects identified in the May, 1988 letter. There is no writing evidencing such an agreement, but both parties recognize that additional work was done. Conopco asserts that the parties reached an oral agreement in August, 1988. The scope of E & Y's responsibilities in its expanded role is hotly disputed by the parties. Conopco maintains that E & Y agreed in August, 1988 to assume overall responsibility for the delivery of a completed computer system to Faberge, while E & Y maintains that it was merely given additional work on a "per diem" basis.

One major area of disagreement between the parties is E & Y's responsibility for programming and delivering working software programs. Although the May, 1988 letter contemplated only the delivery of design documentation and program specifica-

tions, E & Y's role on several of the projects was expanded to include the actual programming and delivery of a workable program. These projects included the export system, the demonstration system, and the sales reporting system. Although at least some of the programming for these projects was done by contract programmers, the oversight of the programmers and the final program were, according to Conopco, the responsibility of E & Y.

E & Y was also assigned the task of conducting prototype studies for the United States and Europe. This consisted of meeting with the systems' users and identifying their needs, comparing these requirements to the functionality provided by the ASI software, identifying the shortfalls, if any, of the ASI software and the modifications necessary to fit Arden's needs, and prioritizing the necessary modifications. The modifications were divided into three categories based on their priority: those that had to be done before "implementation" (the migration from the Lilly systems) ("Release 0"), those that could be done after implementation ("Release 1"), and those that were not essential but would be "nice to have" ("Release 2"). Although Faberge knew prior to the prototype studies that some modifications to the ASI software would be necessary in certain areas, the exact nature and extent of the modifications were not known until after the prototype studies were completed. Faberge's Callahan testified at his deposition that the prototype studies were beyond the range of skills of Faberge's MIS personnel and that, therefore, this was an area in which E & Y's professional expertise was sought.

The parties also differ substantially in their characterizations of E & Y's responsibility with respect to project management. Conopco contends that E & Y was responsible for the entire Arden computer system as the project manager in both the United States and Europe. E & Y, on the other hand, claims that it was not asked to and did not ever assume complete responsibility for the design, development, and implementation of all new systems. Rather, it asserts that its personnel were used only on an "as needed" basis and that, at most, it served in a "coordinator/advisory capacity." According to E & Y, project management control for the systems implementation remained with Callahan in both the United States and Europe and also with DeMartino in the United States.

As evidence of its role, E & Y points out that various activities related to the implementation of new systems at Arden were performed by Faberge and Arden MIS personnel, Arden users, ASI consultants, and other third-party contractors—in other words, by parties other than E & Y. With respect to Faberge and Arden MIS personnel, these activities included installation and modification of the order processing software of ASI and the ship verification function of the order processing software. E & Y also claims that, with respect to Europe, the MIS staffs of Faberge and Arden, and not E & Y, were responsible for the interfaces between the ASI system in North Acton, England and Arden's European affiliates, two sales reporting systems called "CARE" and "AMIS," and an order entry system to process "MSI" orders (orders transmitted from hand held terminals) from the Arden affiliate in France. E & Y also points out that Faberge and Arden MIS personnel had responsibility for maintaining the computer hardware and computer operations support. Similarly, E & Y notes that ASI was responsible for providing training on certain systems to Arden personnel, integration testing for the general ledger system, and certain modifications of the customer order processing and other software modules.

Conopco counters E & Y's characterization of its role in the Arden project with evidence that E & Y had supervisory authority over at least a substantial number of people, including contract programmers, working on various portions of the project. In addition to citing the deposition testimony of Faberge's Callahan, Conopco notes that the personnel evaluations of several E & Y employees who worked on the project indicate that E & Y employees' responsibilities included managing and coordinating both "client" (Faberge and Arden) and ASI personnel. In addition, Conopco points out that E & Y personnel had software modification responsibilities in the

areas of order processing, manufacturing, accounting, inventory, and sales forecasting. Further, E & Y employees had at least some joint responsibility with Arden employees for the "tuning" of the computer hardware and the stabilization of the data center. Finally, as evidence of the "pervasive control" exercised by E & Y, Conopco notes that E & Y's Bryan Kornreich, not Faberge or Arden personnel, wrote a status report of the implementation project as of March 15, 1989.

### C. Problems with the Arden System

Lilly ceased providing computer services to Arden in the United States on June 1, 1989. The services from Lilly to Arden in Europe were terminated on July 3, 1989, except for the computer systems support for Arden's financial applications, which continued until July 22, 1989. Accordingly, the new Arden systems were activated in the United States on or about June 1, 1989 and in Europe on or about July 3, 1989. Conopco asserts that a host of problems ensued attributable to E & Y's substandard performance, problems ranging from system errors resulting in inventory and order processing difficulties to an inability to maintain or perform proper financial control and planning.

Most basic among Conopco's complaints is that the systems' response times were unacceptably slow, particularly in the areas of order entry and inventory. The response time between entering information and the completion of processing so that the next order could be entered ranged anywhere from a "routine" but intermittent few minutes to as long as half an hour, when, according to one witness, three or four seconds would ordinarily be considered acceptable.

Another problem alleged by Conopco is that the system was unable to complete its "batch" processing. Batch processing, the method by which the computer system would process, sort, and store information inputted during the day, was to be performed each night as to the information received during the preceding day. According to Conopco, the system encountered excessively long batch cycles, causing it to be unavailable during part of the day, thereby decreasing the amount of work that could be done on it during the day. As a result of both slow response times and excessive batch processing time, Conopco claims, Arden was unable to fill or ship orders in a timely manner, causing invoices to back up to the point where shipments were missed or delayed. Conopco cites delays of an average of ten days, up from two or three days previously, in delivery of products in Europe.

Another less obvious effect of the poor performance alleged by Conopco was Arden's inability to run certain programs necessary for financial control and planning. Specifically, Conopco claims that because the nighttime processing, which usually encompassed its general ledger, accounts receivable, and master scheduling applications, was dominated by the excessive batch processing time, these programs could not be run and the financial controls ordinarily provided by them were absent. Conopco contends that these difficulties were exacerbated by inadequate documentation. Because there were no adequate records of what changes were made to the ASI software and how and why they were made, identification and amelioration of problems was made extremely difficult.

Conopco also complains of E & Y's failure to perform adequate testing on the system. In essence, Conopco contends that if more substantial testing was done before the new Arden system went "live," some of the system failures could have been avoided. Specifically, Conopco complains that neither a "stress test" nor a complete "system test" was done and that, as a result, problems such as response time and processing power were not diagnosed and taken care of prior to the cut off date. The failure to test was due at least in part to the short time frame within which the project had to be completed. In addition, there is at least some deposition testimony to suggest that even if testing had identified certain "bottlenecks" prior to activation, the implementation plans would not have changed. DeMartino Dep., Haveles Aff., Exh. 6, at 493.

Finally, Conopco faults E & Y for lacking sufficient quality control procedures. It claims that only one review was conducted and that more were necessary. Conopco alleges, as well, that those problems identified

in the review that was done were not addressed and that E & Y never showed the results of the review to Faberge.

### D. Unilever's Acquisition of Arden

In December, 1988, prior to the activation of the Arden computer system, Unilever, Conopco's parent, began negotiations to purchase Arden from Faberge. In connection with the negotiations, Unilever began a "due diligence" investigation of Arden in January, 1989. After several months, in March or April, 1989, however, talks collapsed and the investigation was halted. During this initial due diligence investigation, Unilever relied on discussions with E & Y and Faberge MIS personnel. Conopco claims that although the personnel from Unilever and Chesebrough–Pond's USA Co. ("Chesebrough"), another Unilever subsidiary, concluded at this point that there would be some business disruption as a result of the cutover to the new system, they were reassured by E & Y's presence on the project.

A second opportunity for Unilever to conduct a due diligence investigation came after acquisition talks resumed, and shortly before Unilever signed the agreement to purchase Arden from Faberge. Eugene Goodmaster, the head of MIS for Chesebrough, discussed the Arden system on a conference call between Callahan and DeMartino of Faberge and McCreadie and Kornreich of E & Y. Goodmaster testified at his deposition that he was told that the system was installed and operational, but that some startup problems were being experienced. This conversation left him with the same concerns as to the viability of the new system that Unilever personnel had expressed after the initial due diligence investigation.

On or about July 12, 1989, Unilever signed an agreement to purchase the personal products business of Faberge and the operating business of Arden. The purchase was structured as a sale of assets, rather than a sale of stock, and was made contingent on the Arden

computer system being "operational" at the time of closing. Purchase Agreement, Sue Aff. Exh. 22, §§ 6.19, 7.02. Between the time the Purchase Agreement was signed and the August 3, 1989 closing date, on which date Conopco acquired and took over the businesses, Chesebrough personnel had access to the Arden computer system in the United States and Europe. E & Y contends that, during this time, Unilever had an opportunity to see the Arden system in operation, the problems that were occurring, and the impact of those problems on Arden's business. Conopco claims, on the other hand, that it was only able to discern the full scope of the problems with the system, as well as how Conopco was allegedly misled or misinformed by E & Y, after it had unfettered access to the system and had "lived with it" following the acquisition. Eventually, in July or August of 1990, the decision was made to replace the Arden computer system.

### III. Summary Judgment Motion

#### A. Professional Malpractice

Conopco, in its Second Claim for Relief, alleges professional negligence and malpractice on the part of E & Y. E & Y moves for summary judgment on this claim on several different grounds. First, E & Y contends that New Jersey does not recognize a cause of action for malpractice against management consultants.[3] Second, E & Y argues that even if New Jersey does recognize such a cause of action, Conopco, as the assignee of Faberge by means of the Purchase Agreement, cannot bring this tort claim because under New Jersey law tort claims are not assignable before judgment. Third, E & Y maintains that even if such a claim is recognized and assignable, it is without merit and should be dismissed as a matter of law.

Before it is appropriate to reach the merits of Conopco's claims of professional negli-

---

3. Conopco takes issue with E & Y's description of its claim as "computer malpractice" or "management consultant malpractice", complaining that it over narrowly defines Conopco's "garden variety" claim for professional malpractice. (Conopco Br. at 32). While, to be sure, the Second Claim for Relief in the complaint is captioned "Professional Negligence and Malpractice", the thrust of that claim and, indeed, the language used in that claim, concerns the standard of care owed by management consultants. Given the disposition herein, however, the nomenclature is irrelevant.

gence and malpractice, assuming for a moment that that exercise will be necessary, the court must consider the threshold question of assignability. Conopco asserts these causes of action as the assignee of the general assignment clause of the July 12, 1989 purchase agreement. *See* Sue Aff., Exh. 22 § 2.01; Sue Aff., Exh. 23; Sue Aff., Exh. 63 at 15–16. As noted earlier, E & Y contends that Conopco cannot assert these claims because under New Jersey law tort claims are not assignable prior to judgment. Conopco counters that the validity of the tort claims is governed by the law of New York, rather than that of New Jersey, and that under New York law, tort claims can be assigned prior to judgment. Thus, the court must determine which state's law governs the purported assignment of the tort claims.

As a federal court sitting in diversity, this court must apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 491, 61 S.Ct. 1020, ——, 85 L.Ed. 1477 (1941). The purchase agreement which purported to assign the tort causes of action to Unilever (and thereby to Conopco), provides that "This Agreement shall be governed by and construed in accordance with the laws of the State of New York." Sue Aff., Exh. 22 § 12.10. Based on this provision, Conopco asserts that New York law should govern the validity of the assignment of the tort claims.

Generally speaking, New Jersey choice of law rules permit the parties to a contract to choose which state's law will govern issues arising out of that contract. "Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey will uphold the contractual choice if it does not violate New Jersey's public policy." *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 341, 614 A.2d 124 (1992); *see also Citibank, N.A. v. Errico*, 251 N.J.Super. 236, 243, 597 A.2d 1091 (App.Div.1991). In this regard, New Jersey follows the Restatement (Second) of Conflicts of Laws § 187, which provides that a contractual choice of law provision will be enforced as long as the forum chosen bears a reasonable relationship to the parties or the transaction and the application of the law of the chosen state would not violate a fundamental policy of the state whose law would otherwise apply. *See Instructional Systems*, 130 N.J. at 342, 614 A.2d 124; *Kalman Floor Co. v. Jos. L. Muscarelle, Inc.*, 196 N.J.Super. 16, 21–22, 481 A.2d 553 (App.Div.1984). There is no dispute that New York has a sufficient nexus to the parties and the transaction to satisfy the first prong of New Jersey's test. Assuming for the moment that the application of New York law to the assignment would not violate a fundamental public policy of New Jersey, New York law would govern the validity of the assignment.

Conopco, however, fails to address an issue which must be preliminary to a determination as to whether the assignment of the tort cause of action was valid. It is well recognized that there is a distinction between the validity of an assignment as between the parties to the assignment agreement and the general assignability of a tort chose in action. This distinction has been stated clearly by Professor Leflar:

Attempted assignments of simple nonnegotiable choses in action may present two separate conflicts questions. One question is as to the inherent assignability of the chose in action. This is most readily classifiable as a property problem, referable to the law under which the chose in action came into existence. Since most choses in action arise either out of contracts or torts, this means that the law which governed the original transaction either as a contract or as a tort normally determines the assignability of the claim, though sometimes the effort to assign a situs to the chose in action causes the reference to be made to this fictitious situs. If a chose in action is not assignable, the original obligor's obligations are not affected by a purported assignment of it, regardless of the effect of it as between the assignor and assignee.

The second question has to do with the validity and effect of the assignment, and becomes a real question in most cases only after the first question has been answered by a decision that the claim was an assignable one.

Robert A. Leflar, *American Conflicts Law* § 185 at 379–80 (3d ed. 1977) (footnotes omitted). *See also* Eugene F. Scoles and Peter Hay, *Conflict of Laws* § 1928 (1984) ("The issue of assignability of an intangible would seem most closely related to the original transaction out of which the obligation arose and hence should be determined by the law most significantly related to that original transaction and the parties to it, with respect to the issue of assignability.").

Sections 208 and 209 of the Restatement (Second), Conflict of Laws, similarly analyze the issue. Although these sections relate to the voluntary assignment of contractual rights not embodied in a document, and the illustrative cases generally involve the assignment of rights to receive either money or goods, the Restatement's introductory note to this topic states that "The rules stated in these sections, however, should also be applicable to the assignment of all other contractual rights not embodied in documents. It seems probable that the rules stated in this Topic are also applicable to assignments of rights of action in tort." Restatement (Second), Conflict of Laws, at 676–77.

Section 208 provides that whether a contractual right can be assigned is to be governed by the law of the state with the most significant relationship to the contract and the parties with respect to the issue of assignability. In other words, the *assignability* of a right arising out of a contract is to be governed by the law which would govern the contract generally. By contrast, section 209 dictates that the *validity* of an assignment of a contract right as between the assignor and assignee is to be governed by the law of the state with the most significant relationship "to the assignment and the parties." Restatement (Second), Conflict of Laws, § 209. Thus, while the validity of an assignment is determined by looking to the law of the forum with the most significant relationship to the assignment itself, the assignability of the right or obligation being assigned is determined by looking to the law which would govern the underlying contract (or, here, tort) which enabled the right to come into existence.

Although there is a paucity of case law concerning choice of law relating to the assignability of tort claims, cases addressing choice of law issues in the context of the assignment of contractual rights provide support for the proposition that it is the law of the forum with the most significant contacts to the underlying transaction which must govern the question of assignability. For instance, the court in *Fox–Greenwald Sheet Metal Co. v. Markowitz Bros., Inc.*, 452 F.2d 1346, 1353–54 (D.C.Cir.1971), in determining the effect of a nonassignability provision in a contract, looked not to the law of the forum in which the assignment was made but, rather, to the law of the state with the greatest relationship to the contract which contained the nonassignability clause. Other cases support the position taken in section 209 of the Restatement that the validity of an assignment of an intangible, at least as between the assignor and assignee, is governed by the law of the forum with the greatest contacts to the contract of assignment. *See Callwood v. Virgin Islands National Bank*, 221 F.2d 770, 774 (3d Cir.1955); *RCA Corp. v. Tucker*, 696 F.Supp. 845, 853 (E.D.N.Y. 1988). *Cf. In re Lea Fabrics, Inc.*, 226 F.Supp. 232, 236 (D.N.J.1964) (the place of assignment is inappropriate in determining the validity of assignment vis a vis creditors of the assignor or assignee).

■ The rule enunciated in the Restatement and endorsed by Leflar is a sound one. A chose in action is intangible property which owes its existence to the law of a particular forum. It is fitting that the law from which the chose in action itself springs also governs the assignability of the chose in action. Parties cannot create rights of assignability beyond those permitted by the law of the state in which the cause of action arose simply by entering into a contract of assignment in a state whose law recognizes the assignability of the chose in action. In this case, then, the assignability of the tort claims must be governed by the law of the state which would govern the substantive malpractice and professional negligence claims.

■ The court must apply New Jersey's choice of law rules to determine whether

New York or New Jersey law would govern the malpractice and negligence claims. The result is clear: both parties agree, and the court concurs, that New Jersey conflicts rules mandate that New Jersey substantive law governs the substance of the tort claims. *See* Pl.Br. at 24–25; Def. Reply Br. at 12. New Jersey applies a flexible governmental interest analysis in tort cases. *Veazey v. Doremus*, 103 N.J. 244, 248, 510 A.2d 1187 (1986); *Pancza v. Remco Baby, Inc.*, 761 F.Supp. 1164, 1168 (D.N.J.1991). As Conopco notes, New Jersey was, for the most part, the location in which the conduct at issue took place, the location of the Arden computer system, and the location in which the alleged harm occurred, and consideration of the more specific issue of the assignability of tort claims does not suggest the application of any law other than that of New Jersey. Therefore, the issue of assignability of the tort claims raised here must be analyzed under New Jersey law.

The only New Jersey statute dealing with assignability is section 2A:25–1, which provides in relevant part:

> All contracts for the sale and conveyance of real estate, all judgments and decrees recovered in any of the courts of this state or of the United States or in any of the courts of any other state of the United States and all choses in action arising on contract shall be assignable, and the assignee may sue thereon in his own name.

N.J.Stat.Ann. 2A:25–1 (West 1987). Because the statute, which provides for the assignability of contracts, does not address tort causes of action, the court must look to the state's common law for guidance. New Jersey courts have consistently held that tort claims cannot be assigned prior to judgment. The New Jersey Court of Errors and Appeals long ago made this position clear:

> It has always been held that the right to bring an action in the courts of this state is possessed by the injured person alone, unless the injured person assigns his right to someone else, which cannot be done before judgment when the action sounds in tort, as is the case here.

*United States Casualty Co. v. Hyrne*, 117 N.J.L. 547, 552, 189 A. 645 (E & A 1937) (citation omitted).

One year after *Hyrne*, the Supreme Court of New Jersey held that tort claims cannot be assigned prior to judgment. *East Orange Lumber Co. v. Feigenspan*, 120 N.J.L. 410, 413, 199 A. 778 (1938). The court in *East Orange Lumber* noted that the rule it followed was firmly embedded in the common law. *Id.* Moreover, the court reasoned, the fact that the then-existing statute providing that contract claims were assignable prior to judgment made no mention of tort claims was "sufficient to indicate that the legislature did not mean that the same privilege should be had by the assignee of a chose in action arising out of a tort." *Id.* at 412, 199 A. 778.

More recently, New Jersey courts have reaffirmed the legislature's position on the assignability of choses in action arising out of tort. In *Di Tolvo v. Di Tolvo*, 131 N.J.Super. 72, 79, 328 A.2d 625 (App.Div.1974), the Appellate Division relied on the absence of a statutory provision permitting the assignment of tort claims prior to judgment and followed the common law rule. This position has been echoed by the Law Division: "A tort claim is a chose in action and at first blush it would appear to be assignable. But in New Jersey, as a matter of public policy, a tort claim cannot be assigned." *Costanzo v. Costanzo*, 248 N.J.Super. 116, 121, 590 A.2d 268 (Law Div.1991).[4] This court, too, has recently upheld the propriety of this rule. *See Amland Properties Corp. v. Aluminum*

---

4. Even were the court to reach the issue of the validity of the assignment, it is not at all clear that the contractual choice of law provision favoring New York law would be applied. As previously noted, New Jersey will abide by contractual choice of law provisions as long as they do not violate a fundamental public policy of the State. *Instructional Systems*, 130 N.J. at 341, 614 A.2d 124; *Errico*, 251 N.J.Super. at 243, 597

A.2d 1091. To the extent that *Costanzo*'s statement can be viewed as indicating that the nonassignability of tort choses in action rises to the level of a "public policy," fundamental or otherwise, the contractual choice of law provision could be in jeopardy. Inasmuch as this issue is not presented, the court states no opinion as to whether such a result would obtain.

*Co. of America,* 808 F.Supp. 1187, 1197 (D.N.J.1992).

█ It is clear that under New Jersey law, choses in action arising out of tort are not assignable prior to judgment. Because Conopco asserts its claims of professional negligence and malpractice only as an assignee, those tort claims must fail as a matter of law. Inasmuch as the claims are precluded on this basis, the court need not determine whether New Jersey would recognize professional negligence and a claim for malpractice against management consultants. Summary judgment will be granted as to the Second Claim for Relief.

B. Breach of Warranty under the U.C.C.

The Third Claim for Relief alleges that E & Y provided the Arden computer system to Faberge in a condition that breached the implied warranty of fitness for the purpose for which it was intended. Complaint ¶¶ 44–52. This claim relies on section 2–315 of the Uniform Commercial Code ("U.C.C."), codified in New Jersey at N.J.Stat.Ann. 12A:2–315 (West 1962 & Supp.1992). E & Y moves for summary judgment as to this claim, arguing that the transaction did not involve "goods" and that, even if it did, there was no "sale." Section 2–102, which defines the scope of the U.C.C., provides that "Unless the context otherwise requires, this chapter applies to transactions in goods...." "Goods" is defined in the U.C.C. as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale...." N.J.Stat.Ann. 12A:2–105 (West 1962 & Supp. 1992). There being no dispute that if the

U.C.C. applies to the transaction this claim would be sufficient to go to the jury, this portion of E & Y's motion for summary judgment turns on whether the E & Y–Faberge engagement is governed by the U.C.C.

█ The contract between Faberge and E & Y cannot be neatly categorized as exclusively for goods or exclusively for services; rather, it is a mixed goods and services contract.[5] *Newmark v. Gimbel's Inc.,* 54 N.J. 585, 593, 258 A.2d 697 (1969). In considering whether the U.C.C. will apply to a mixed goods and services contract, the court must determine whether goods or services predominate. *Advent Systems Ltd. v. Unisys Corp.,* 925 F.2d 670, 676 (3d Cir.1991) (applying Pennsylvania law). In enunciating the test subsequently endorsed by the Third Circuit in *Advent,* the Eighth Circuit stated:

The test for inclusion or exclusion is not whether [contracts involving goods and services] are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale with labor incidentally involved (e.g. installation of a water heater in a bathroom).

*Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974) (footnotes omitted).

█ In order to determine whether goods or services predominate, the court must look to the "essence," or purpose, of the contract. *Tele–Radio Systems Ltd. v. De Forest Electronics, Inc.,* 92 F.R.D. 371, 374

---

5. In an Order dated April 26, 1991, the court denied E & Y's motion to dismiss Conopco's U.C.C. breach of implied warranty claim stating, because it so appeared at the time, that "the contract at issue is one clearly falling within the ambit of the Uniform Commercial Code." April 26, 1991 Order at 5. It goes without saying, of course, that a statement in the course of denying a motion to dismiss based solely on the face of the complaint is not binding as law of the case, which doctrine pertains only to issues actually decided or decided by implication. *Bridge v. United States Parole Comm'n,* 981 F.2d 97, 103 (3d Cir.1992) (citing *Schultz v. Onan Corp.,* 737 F.2d 339, 345 (3d Cir.1984)). It was not necessary to decide, in denying the motion to dismiss, that the contract was one for the sale of goods under the U.C.C. Moreover, a well established exception to the application of law of the case is that a previous decision will not be binding where new evidence is available. *Bridge,* 981 F.2d at 103; *Schultz,* 737 F.2d at 345; *Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162, 169–70 (3d Cir.1982). Because the previous motion was made pursuant to Rule 12(b)(6), no evidence outside the pleadings was considered. The voluminous exhibits submitted in conjunction with the summary judgment motion, then, all constitute "new" evidence. Accordingly, it is proper that the court now consider the legal argument made by E & Y and opposed by Conopco with the full benefit of the parties' discovery.

(D.N.J.1981); *Meyers v. Henderson Constr. Co.*, 147 N.J.Super. 77, 82, 370 A.2d 547 (Law Div.1977); *Advent*, 925 F.2d at 676. In this regard, it is helpful to look at the language and circumstances surrounding the contract. *Advent*, 925 F.2d at 676; *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 460–61 (4th Cir.1983), *cert. denied*, 475 U.S. 1121, 106 S.Ct. 1640, 90 L.Ed.2d 185 (1986); *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 743 (2d Cir.1979); *Ranger Constr. Co. v. Dixie Floor Co.*, 433 F.Supp. 442, 444–45 (D.S.C.1977); *Kirkpatrick v. Introspect Healthcare Corp.*, 114 N.M. 706, 710, 845 P.2d 800, 804 (1992); *Arlington Elec. Constr. v. Schindler Elevator Corp.*, 1992 WL 43112, *4, 1992 WL 43112 (Ohio Ct.App.1992); *Levin v. Hoffman Fuel Co.*, 94 A.D.2d 640, 462 N.Y.S.2d 195, 196 (1983) *aff'd, Levin v. Hoffman Fuel Co.*, 60 N.Y.2d 665, 468 N.Y.S.2d 104, 455 N.E.2d 663 (1983). In addition, courts have found it useful to examine the compensation structure of the contract. *See Advent*, 925 F.2d at 676; *Triangle*, 604 F.2d at 743; *DeGroft v. Lancaster Silo Co.*, 72 Md.App. 154, 527 A.2d 1316, 1323 (1987); *Colorado Carpet Installation, Inc. v. Palermo*, 647 P.2d 686, 688 (Colo.App.1982) *aff'd, Colorado Carpet Installation, Inc. v. Palermo*, 668 P.2d 1384 (Colo.1983). Finally, the nature of the contract can be gleaned by looking at the interrelationship of the goods and services to be provided; whether one is incidental to the other as well as the intrinsic worth of the goods being provided. *See Tele–Radio Systems*, 92 F.R.D. at 374; *Meyers*, 147 N.J.Super. at 82–83, 370 A.2d 547; *Coakley & Williams*, 706 F.2d at 460; *Triangle*, 604 F.2d at 743; *DeGroft*, 527 A.2d at 1323.

■ The question of whether goods or services predominate in a mixed goods and services contract is one of fact. *Tele–Radio Systems*, 92 F.R.D. at 374; *Downriver Internists v. Harris Corp.*, 929 F.2d 1147, 1151 (6th Cir.1991); *Coakley & Williams*, 706 F.2d at 461; *Arlington Elec. Constr. v. Schindler Elevator Corp.*, 1992 WL 43112, *4, 1992 WL 43112 (Ohio Ct.App.1992). As such, it is for the jury to decide unless, viewing the facts most favorably to Conopco, as the nonmoving party, there is no genuine issue of material fact which could lead a jury

to conclude that "goods" predominated the contract between E & Y and Faberge. *See Tele–Radio Systems*, 92 F.R.D. at 374 (summary judgment inappropriate where the exact nature of the contractual relationship cannot be determined on the record presented); *Downriver Internists*, 929 F.2d at 1151 (goods versus services question properly submitted to the jury); *Back O'Beyond, Inc. v. Telephonic Enterprises, Inc.*, 76 A.D.2d 897, 429 N.Y.S.2d 250, 251 (1980) (record insufficient to allow a ruling as a matter of law). Thus, while the issue may be disposed of as a matter of law, this can only be so where the stringent standards for summary judgment have been met. *See United States v. City of Twin Falls*, 806 F.2d 862, 870 (9th Cir.1986) *cert. denied City of Twin Falls v. Envirotech Corp.*, 482 U.S. 914, 107 S.Ct. 3185, 96 L.Ed.2d 674 (1987) (although the goods versus services question is ordinarily one of fact for the jury, where the contract is unambiguous and there are no facts in dispute it is not error for the court to rule on the issue as a matter of law); *DeGroft*, 527 A.2d at 1323 (trial court improperly ruled as a matter of law that the U.C.C. would apply where a factfinder could reasonably conclude that the contract was one for services).

■ The initial engagement letter of September 8, 1987, drafted by E & Y, unmistakably contemplates a services agreement, referring in its opening to "the management consulting services you requested" and indicating elsewhere that "we will serve as facilitators and implementors." Sue Aff., Exh. 3 at EA412807, EA412809. E & Y's fee, as set forth in the letter, was to be a daily rate for each E & Y employee, with the rate varying depending on the experience level of the employee. *Id.* at EA412810. Nowhere in the terms of this initial letter of engagement is there any mention of goods to be provided or any indication that E & Y would be compensated for providing goods. This letter agreement, however, did not purport to embody all the terms of the overall agreement between Faberge and E & Y but, rather, indicated that another "Letter of Understanding" would be submitted after the first two of the five outlined project phases were completed.

The second letter of understanding, dated May 12, 1988, again drafted by E & Y and sent to Faberge is less easily pigeonholed as detailing either goods or services. As does the September, 1987 letter, it begins by stating that it is an understanding as to "the professional services that you have requested to assist Faberge Inc. (Faberge) in the migration of Elizabeth Arden's data processing services from Eli Lilly." Sue Aff., Exh. 9, at EA 402846. The letter then proceeds to list and describe each of the nine "primary consulting projects" to be undertaken by E & Y. E & Y's responsibility on several of these projects included delivering design documentation and program specifications, but not, at least initially, the programmed software itself.

The entire Faberge–E & Y relationship was not covered by these two letter agreements; indeed, much of the contractual relationship between the two is not embodied in any writing. One such unwritten term, Conopco asserts, is that in or around August of 1988, E & Y agreed to assume the responsibility of delivering the entire Arden computer system. This, Conopco urges, is the "good" which brings the transaction within the ambit of the U.C.C. Faberge's Worldwide MIS Director, Charles Callahan, testified in his deposition that at some point after May, 1988, E & Y's role was expanded beyond providing design documentation and program specifications to include responsibility for the programming for certain of these projects, whether by E & Y personnel or contract programmers. Callahan Dep., Haveles Aff., Exh. 4, at 431–39. In further support of its argument that E & Y was to provide Faberge with the "good" of the Arden computer system, Conopco points out that E & Y was involved in the selection, acquisition, and installation of computer hardware as well as the decision to use ASI software.

It must be noted preliminarily that the Third Circuit's decision in *Advent*, which Conopco presses to this court, is not controlling. Aside from the fact that *Advent* was decided under Pennsylvania law, it is factually distinguishable from this case. The contract under consideration in *Advent* concerned the sale from Advent to Unisys of hardware and software making up certain document management systems to be distributed by Unisys. *Advent*, 925 F.2d at 672. The agreement also provided that Advent would supply marketing and sales support and training for Unisys and its customers, an experienced system builder to work with Unisys personnel, and certain other support services. *Id.* at 674. Finally, Unisys agreed in the distribution agreement that it would buy approximately twenty products from Advent including various types of hardware and software licenses. *Id.* Noting that a major portion of the transaction involved the sale of software, the court concluded, after an extended discussion, that computer software should be considered a "good" within the meaning of the U.C.C., a conclusion with which this court takes no issue. *Id.* at 676. The court then found that the purpose of the contract was to transfer products and that the services promised were merely incidental. *Id.* The court further observed that the fact that Advent was to be compensated on the basis of goods and not services, even for developmental work, was evidence that the parties contemplated a sale of goods. *Id.*

In addition to *Advent*, Conopco relies heavily on two cases it characterizes as "strikingly similar to this one": *USM Corp. v. Arthur D. Little Systems, Inc.*, 28 Mass. App.Ct. 108, 546 N.E.2d 888 (1989) *review denied USM Corp. v. Arthur D. Little Systems, Inc.*, 406 Mass. 1104, 550 N.E.2d 396 (1990) and *Neilson Business Equipment Center, Inc. v. Monteleone*, 524 A.2d 1172 (Del.1987). Opp.Br. at 29. In *USM*, the court held that the U.C.C. was applicable to a contract between Arthur D. Little Systems, Inc. ("ADLS") and its customer wherein ADLS contracted to develop a "turnkey" computer system.[6] ADLS noted in describing its turnkey system development that "the complete responsibility for system develop-

---

**6.** A "turnkey" computer system, as the *USM* court and other courts have recognized, is a system sold as a package and ready to function immediately. *USM*, 546 N.E.2d at 893 n. 9. As in other industries, the use of the term "turnkey" implies that the supplier takes responsibility for delivering a product ready to perform on "the turn of a key." *Id.*

ment—from project definition to complete system delivery—rests with [ADLS]" and that its development and implementation of an operable system would be on a fixed price basis. *USM*, 546 N.E.2d at 890. USM used hardware and software manufactured by Data General. *Id.* Although both ADLS and USM were responsible for various tasks throughout the system development process, the court found that ADLS had used the term "turnkey" in such a way as to place on it, as the vendor of the system, the responsibility for providing a complete and acceptable system. *Id.* at 893. With respect to the goods/services question and the application of the U.C.C., the court simply stated that the parties had assumed the transaction was one for the sale of goods covered by the U.C.C. and that, the services being incidental to the "significant" part of the contract relating to the sale of goods, that assumption was correct.

In *Neilson*, the Delaware Supreme Court considered the goods/services question in the context of a suit by a doctor against Neilson Business Equipment Center, a company that had agreed to provide him with a computer system that would meet his needs. *Neilson*, 524 A.2d at 1173. The parties signed a lease/purchase option agreement covering both hardware and software. *Id.* In order to gain favorable tax and cash flow advantages, the parties agreed on an arrangement under which Neilson sold hardware and software to a leasing company which, in turn, leased the equipment and software to the doctor. *Id.* Neilson did not design the software, but renamed the software it had acquired elsewhere the "Neilson Medical Office Management System" and altered it to fit the doctor's needs. *Id.* When problems developed in implementing the system, Neilson attempted to modify the system and eventually hired a program consultant to try to resolve the problems. *Id.* at 1174.

The court held first that, although the transaction was technically a lease with an option to buy, it was, in effect, a sale which could come under the U.C.C. With respect to the goods/services issue, the court relied at least in part, as had the Massachusetts court in *USM*, on the fact that the transaction was to provide a turnkey computer system. *Id.* at 1174. The court rejected Neilson's argument that the services portion should be separated from the goods portion and noted that

> Dr. Monteleone did not intend to contract separately for hardware and software. Rather, he bought a computer system to meet his information processing needs. Any consulting services rendered by Neilson were ancillary to the contract, and cannot reasonably be treated as standing separately to escape the implied warranties of the Uniform Commercial Code.

*Id.* at 1175 (footnote omitted). The court also noted that the doctor's bookkeeper, who had been in charge of acquiring a computer system, had no prior experience in buying computer technology and that Neilson was responsible for selecting the proper equipment as well as for customizing the software to meet the doctor's needs. *Id.* at 1173, 1176.

*Advent*, *USM*, and *Neilson* are all distinguishable from this case in numerous material respects. Perhaps the most salient distinction is seen in the acquisition of computer hardware important in those cases. It is undisputed that in this case E & Y did not sell or provide any computer hardware or accessories to Faberge. E & Y may have had a role in the selection and installation of hardware, but that role was, at most, an advisory one performed in conjunction with Faberge's MIS staff. This is far different from the situation in *Neilson*, in which the party seeking to implement a computer system had no prior experience in acquiring computer equipment. Moreover, unlike all three cases cited by Conopco, the agreement between E & Y and Faberge was not one for a turnkey computer system.

In addition, E & Y was not compensated on the basis of goods provided but, rather, for each day of employee service it provided. The court in *Advent* noted that payment, even for developmental work performed by Advent, was to be compensated through individual purchases of hardware and software rather than through fees for services. *Advent*, 925 F.2d at 676. Similarly, the agreement in *Neilson* contained a total "purchase price" for hardware, software, and customiz-

ing services that did not contemplate payment for services on an hourly or daily basis. *Neilson*, 524 A.2d at 1173. It is significant, too, that of the total contract price of $333,-913.20 in *USM*, $174,667.20 was for computer hardware. By contrast, E & Y's remuneration, though quite substantial, was not tied at all to the provision of goods, either hardware or software. Faberge did not pay separately for any of the customized software produced by E & Y employees or by contract programmers under the supervision of E & Y. If any conclusion is to be drawn from the structure of the compensation, it is that the parties contemplated a contract for the provision of professional services.

There appear to be no cases factually on point with this case. However, viewing the facts most favorably to Conopco, the nonmoving party, and using the interpretive guideposts discussed by other courts in examining the nature of the contract between E & Y and Faberge, it is clear as a matter of law that the contract was predominantly one for services and that, therefore, the U.C.C. does not apply. While E & Y's responsibility for providing certain customized software and for modifying certain ASI software may not have been wholly negligible, a reasonable trier of fact could not conclude on the evidence of record that these elements dominated the contract. The contract was one for management and computer consulting services, pure and simple, with all of the hardware bought from another company, and most of the software purchased from ASI. Summary judgment will be granted as to the Third Claim for Relief.

### C. Breach of Contract

Conopco alleges, in its First Claim for Relief, that E & Y agreed to design and implement a computer system for Arden that was operational and functional to support Arden's business operations (Comp. ¶ 36), and that E & Y breached that agreement. In support of its motion for summary judgment on Conopco's common law breach of contract claim, E & Y asserts that there was neither a written nor oral agreement to provide "an operational computer system that would perform all the computer functions necessary to conduct and operate Arden's business" (Comp. ¶ 18) and that, even if an oral agreement existed, it would fail for two reasons: (1) it is unenforceable under the Statute of Frauds and (2) it was never assigned to Unilever and, therefore, Conopco cannot assert rights it was never assigned. Because both of these assertions are flawed and there are substantial facts in dispute, E & Y's summary judgment motion insofar as it addresses the breach of contract claim must be denied.

### 1. Statute of Frauds

The Statute of Frauds, codified in New Jersey at N.J.Stat.Ann. 25:1–5 (West Supp. 1992), mandates that in order to be enforceable, certain types of agreements must be in writing. Included among these, and as relevant here, are contracts which are not to be performed within one year of the time of contracting. There is no dispute that the September 8, 1987 and May 12, 1988 letters sent to Faberge and signed by E & Y constitute writings which covered at least part of the agreement between the parties. *See Vanguard Telecommunications, Inc. v. Southern New England Telephone Co.*, 722 F.Supp. 1166, 1178 (D.N.J.1989), *aff'd*, 900 F.2d 645 (3rd Cir.1990). Noting that there is no writing evidencing an agreement pursuant to which it supposedly assumed responsibility for the entire Arden computer system, E & Y contends that the breach of contract claim must be based upon an oral agreement; indeed, Conopco does not dispute that there was an oral agreement, albeit one in which it alleges E & Y assumed responsibility for the entire development and implementation of the Arden computer system. Because this was an oral agreement which was not to be performed within one year, E & Y argues, it is unenforceable under the Statute of Frauds.

The pertinent portion of the Statute of Frauds provides:

> No action shall be brought upon any of the following agreements or promises, unless the agreement or promise, upon which such action shall be brought or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person thereunto by him lawfully authorized:
>
> \*     \*     \*     \*     \*     \*

e. An agreement that is not to be performed within one year from the making thereof;

N.J.Stat.Ann. 25:1–5 (West Supp.1992).

Conopco argues, first, that the oral agreement, which it claims was reached in August, 1988, was to be performed within one year, inasmuch as the computer system was to be operational by July 1, 1989. E & Y vigorously disputes this claim, pointing out that Conopco contends elsewhere that E & Y assisted in the selection and implementation of computer hardware and ASI software, both of which were done prior to June, 1988. The factual dispute between the parties is not one which can be resolved by the court. Apt here is the Supreme Court of New Jersey's decision in *Loeb v. Peter F. Pasbjerg & Co.*, 22 N.J. 95, 99, 123 A.2d 522 (1956). The court in *Loeb* rejected a Statute of Frauds defense where a jury could conclude, based on disputed evidence, that there was an oral agreement which had no fixed term and was performable within a year. *Id.* The court noted that:

Our cases hold, as do decisions elsewhere, that [the provision of the Statute of Frauds applying to contracts not to be performed within one year] is inapplicable to an oral agreement bearing no fixed term and possibly performable within the year even though complete performance within that time may be unlikely.

*Id.; see also Vanguard*, 722 F.Supp. at 1178. This court finds that a jury could conclude from the facts set forth, disputed as those facts now are, that there was an oral contract which was performable within one year, rendering summary judgment on this basis inappropriate.

Even if the oral contract was not performable within one year, the Statute of Frauds would not bar the contract claim. It is a well settled exception to the Statute of Frauds that an oral agreement not performable within one year may be enforced where one party has fully performed. *Kreuzburg v. Computer Sciences Corp.*, 661 F.Supp. 877, 879 (D.N.J.1987); *Edwards v. Wyckoff Elec. Supply Co.*, 42 N.J.Super. 236, 242, 126 A.2d 29 (App.Div.1956); *Hoblin v. Wyckoff General Supply Co.*, 42 N.J.Super. 364, 366–67, 126 A.2d 365 (App.Div.1956); *Thompson v. Van Hise*, 133 N.J.L. 524, 527, 45 A.2d 182 (Sup. Ct.1946); 2 Arthur L. Corbin, *Corbin on Contracts* § 457 at 577 (1950 & Supp.1992). It is undisputed that E & Y has been fully paid under the contract. Faberge having fully performed under the contract, E & Y cannot now avoid enforcement of the contract under the Statute of Frauds.

Parenthetically, E & Y's argument that New Jersey law requires both that the terms of the contract be established by clear, definite, and unequivocal evidence and that the acts of performance relied on must be exclusively referable to the contract is misplaced with reference to the Statute of Frauds. The standards invoked and the law cited relate to the doctrine of part performance, an equitable doctrine wholly separate from the principle that full performance by one party takes a contract out of the Statute of Frauds. 2 Arthur L. Corbin, *Corbin on Contracts* § 459 at 582 (1950 & Supp.1992). In contrast to cases in which specific performance of an oral agreement or some other equitable relief is sought, Conopco seeks only money damages. Thus, the doctrine of part performance is inapplicable.[7]

2. Assignment

E & Y contends that the oral agreement between the parties which came after the May, 1988 letter and concededly expand-

---

7. Moreover, although E & Y cites New Jersey case law supportive of the proposition that the party invoking the doctrine of part performance must establish a clear, definite, and unequivocal contract and the acts relied upon must be exclusively referable to the alleged contract, the cases cited involve alleged oral agreements to make testamentary dispositions of real property. *See Young v. Sabol*, 4 N.J. 309, 310–11, 72 A.2d 846 (1950); *Epstein v. Fleck*, 141 N.J.Eq. 486, 488, 57 A.2d 395 (E & A 1948); *Cooper v. Colson*, 66 N.J.Eq. 328, 330, 58 A. 337 (E & A 1904); *see also Cauco v. Galante*, 6 N.J. 128, 137, 77 A.2d 793 (1951) (contract for the sale of real property) *Deutsch v. Budget Rent–A–Car*, 213 N.J.Super. 385, 387, 517 A.2d 491 (App.Div.1986) (same); *Kufta v. Hughson*, 46 N.J.Super. 222, 225, 134 A.2d 463 (Ch.Div.1957) (sale of land and business located thereon). Thus, even were the part performance doctrine properly before the court, the cases cited do not help E & Y.

ed the scope of its duties on the Arden project was not assigned by Faberge and Arden to Unilever. The parties differ in their interpretation of the Purchase Agreement as to whether it included an assignment of Faberge's rights under the oral contract. A fair reading of that contract yields the conclusion that such rights were assigned.

Section 2.01 of the Purchase Agreement indicates that the sale covered "all right, title and interest ... in and to all the Assets...." Sue Aff., Exh. 22, § 2.01. The definitional section of the agreement provides that "Assets" includes "all the assets, properties, goodwill, business and other rights of every kind and nature whatsoever, tangible or intangible, real, personal or mixed, and wherever located, used in connection with or relating to the Business, including, without limitation ... rights under Contracts...." *Id.* § 1.01. "Contracts" is then defined as "any and all other contracts or binding arrangements ... whether written or oral, express or implied." *Id.*

Section 4.13 of the Purchase Agreement, which is part of the "Representations and Warranties" portion of the agreement, indicates that Supplemental Schedule 4.13 "contains a list and, with respect to oral contracts, a brief description of certain Contracts to which the Sellers and the Purchased Entities are parties." *Id.* § 4.13. This section further states "Except for Contracts listed in Schedule 4.13, no Seller, with respect to the Business, or Purchased Entity is a party to any ... (10) other Contract involving payments of more than $250,000 for any such contract; ... (12) Contract not made in the ordinary course of business." *Id.*

Supplemental Schedule 4.13(10), purporting to list contracts with payments greater than $250,000, lists the September 8, 1987 and May 12, 1988 letters from E & Y.[8] Sue Aff., Exh. 24. E & Y argues that because neither this part nor any other part of Supplemental Schedule 4.13 lists an oral agreement between the parties, any such oral contract was not assigned to Unilever. This argument must be rejected out of hand.

Conopco argues that the assignment was effected by the general assignment provision of section 2.01 and that section 4.13 does not affect assignment. Section 4.13 is a representation and warranty by the sellers that, except for the contracts listed in the corresponding supplemental schedule 4.13, no seller or purchased entity is a party to any contract involving the payment of more than $250,000. The plain and unambiguous language of section 4.13 indicates that it does not purport to affect which assets are assigned under the agreement. Indeed, section 2.01, the part of the agreement expressly pertaining to assignment, does not make mention of or incorporate by reference section 4.13.[9] Thus, if the oral agreement between E & Y and Faberge is, in fact, a contract involving the payment of more than $250,000, Faberge and the sellers may have breached their warranty to Unilever. This does not mean, however, that such a contract, if it exists, and the rights thereunder were not assigned to Unilever under section 2.01. To attribute such a meaning to section 4.13 would be to go beyond the plain meaning of the Purchase Agreement. The court holds, instead, that the assignment of an oral contract would be effected by the general

8. This schedule also lists a July 11, 1989 letter from E & Y. E & Y states in its brief that it is not aware of any letter of that date and Conopco does not take issue with E & Y's disclaimer of the existence of such a letter. The court is left to conclude, therefore, that there was no such letter between the parties and that the reference in Supplemental Schedule 4.13(10) was in error.

9. E & Y disingenuously relies in its reply brief on the "Excluded Assets" provision to attempt to characterize section 4.13 as "critically important" to determining what was assigned. While E & Y correctly notes that the definition of "Assets" excludes all things falling within the definition of "Excluded Assets," it fails to point out

that the definition of "Excluded Assets" in section 1.01 makes no mention whatsoever of section 4.13 but, rather, lists only specific assets which are excluded and states generally that "Excluded Assets" includes all assets other than those included in the term "Assets." All semantic gobbledygook aside, this advances E & Y's argument not one iota. There is no indication that section 4.13 is at all relevant to which assets were subject to the assignment and which were specifically excluded. Hence, there is no basis to conclude that the assignment of the alleged oral contract is governed by anything other than the general language of section 2.01 of the Purchase Agreement.

assignment section 2.01, regardless of whether such contract was listed in supplemental schedule 4.13.

E & Y's motion for summary judgment relating to Conopco's common law breach of contract claim will be denied.[10]

An appropriate order will issue.

## ORDER

This matter having been opened to the court upon the motion of defendant for summary judgment, pursuant to Fed.R.Civ.P. 56(c); and the court having considered the submissions of the parties both in support of and in opposition to the motion and having heard the argument of counsel;

IT IS on this 12th day of July, 1993, for the reasons expressed in this court's Opinion of even date, hereby

ORDERED that defendant's motion for summary judgment is granted as to plaintiff's claims of professional negligence and malpractice and breach of implied warranty; and it is further

ORDERED that defendant's motion for summary judgment is denied as to plaintiff's breach of contract claim.

10. Trial, therefore, will go forward solely on the breach of contract claim, with Conopco being required to prove, by a preponderance of the evidence, the services which Faberge retained E & Y to render, the services which E & Y in fact rendered, and that performance of E & Y was not in accordance with its agreement with Faberge.